**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephen Gesell, | No. CV-24-08090-PCT-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| City of Cottonwood, et al., | |
| Defendants. | |

Stephen Gesell ("Plaintiff"), the former Chief of Police of the City of Cottonwood ("Cottonwood"), has sued Cottonwood and assorted current and former city officials (collectively, "Defendants") for wrongful termination, defamation, due process violations, and various statutory infractions. (Doc. 6.) Plaintiff now moves to disqualify Defendants' counsel, alleging various conflicts of interest. (Doc. 8.) For the reasons that follow, Plaintiff's motion is denied.

## RELEVANT BACKGROUND

### I. Parties And Representatives

Plaintiff is the former Chief of Police of Cottonwood. (Doc. 6 ¶¶ 11, 69, 82.)

At all times relevant to this litigation, Tim Elinski ("Defendant Elinski") was the Mayor of Cottonwood (*id.* ¶ 3), Scotty Douglass ("Defendant Douglass") was the Cottonwood City Manager (*id.* ¶ 5), and Jesus "Rudy" Rodriguez ("Defendant Rodriguez") was the Cottonwood Deputy City Manager (*id.* ¶ 4). Jennifer Winkler ("Defendant Winkler") was Cottonwood's City Attorney (*id.* ¶ 6), Amanda Wilber ("Defendant

1  Wilber") was Cottonwood's Human Resources Manager (*id.* ¶ 7), and Helaine Kurot
2  ("Defendant Kurot") was a member of the Cottonwood City Council (*id.* ¶ 8).

3         Defendants in this litigation are jointly represented by the law firm Pierce Coleman
4  PLLC ("PC") and specifically by counsel of record, Justin S. Pierce and Joseph D. Estes
5  (collectively, "Counsel"). (Doc. 1-3.) "PC provides legal representation to [Cottonwood]
6  in employment-related matters under an agreement with the Arizona Municipal Risk
7  Retention Pool." (Doc. 14-1 at 20.) PC also employs attorney Stephen Coleman
8  ("Coleman"), who conducted the 2022 employment investigation described below, and
9  Defendant Winkler, who joined the firm in 2023 after finishing her work as Cottonwood
10 City Attorney. (Doc. 8 at 3; Doc. 14 at 6.)

11 II.    Detective Dever's Allegations

12        In January 2022, Cottonwood City Detective Kiedi Dever ("Dever") began an
13 extended leave of absence to address concerns about her mental health. (Doc. 6 at 31.)
14 While on leave, Dever filed a charge of discrimination (the "Charge") with the Civil Rights
15 Division of the Arizona Attorney General's Office ("ACRD"), alleging that the
16 Cottonwood Police Department had discriminated against her based on sex. (Doc. 14-1 at
17 2.)

18        On June 8, 2022, Plaintiff emailed Dever and informed her that she would not return
19 as a detective following her leave of absence but would instead be transferred to a patrol
20 unit. (Doc. 14-1 at 10.) Plaintiff contends that he "approved this action after seeking
21 advice of" former City Attorney Steve Horton ("Horton") and PC. (Doc. 6 ¶ 43.) Plaintiff
22 further contends that "[his] intentions were also shared with (then) City Manager Ron
23 Corbin and Defendant Wilber." (*Id.* ¶ 46.)

24        On June 9, 2022, Horton forwarded the Charge to PC, requesting the firm's
25 assistance. (Doc. 14-1 at 17.)

26        On June 10, 2022, Coleman received a copy of the Charge. (*Id.* at 20.)

27        "On or about June 13, 2022, [Dever] was released to return to full duty based on an
28 independent medical examination by a psychologist." (Doc. 6 at 32.) Plaintiff, consistent

with his earlier email, reassigned Dever to the position of patrol officer "to reacclimate her to basic policing skills after her five-month absence and to maximize her opportunity for success." (*Id.* at 36-37 n.2.)

On July 21, 2022, following an investigation into the Charge, Coleman submitted a response to ACRD on behalf of Cottonwood, asserting that "[Cottonwood] did not unlawfully harass or discriminate against [Dever] based on her sex or any other protected characteristic. Nor did [Cottonwood] retaliate against [Dever] for engaging in protected activity." (*Id.* at 28.) Coleman further asserted that "there was no retaliatory motive" for Dever's transfer, especially given that "[Plaintiff] made the decision to assign [Dever] to patrol before he learned of her charge of discrimination." (*Id.* at 36-37 n.2.)

On April 20, 2023, almost a year later, Dever amended the Charge to include additional allegations of disability discrimination. (Doc 14-1 at 23-24.) The amended Charge also alleged that "[o]n or about June 8, 2022, [Dever] met with [Plaintiff] who was very angry and stated that [her] complaint with the ACRD would not go anywhere and that [she] should not have broken the chain of command." (*Id.* at 24.) Dever further alleged in the amended Charge that Plaintiff "stated that [Dever] would never go back to Detective while he was chief." (*Id.*) According to the amended Charge, Dever "was demoted and placed in Field Training" and the 5% salary increase she received as a detective was rescinded. (*Id.*) According to the amended Charge, this type of reassignment was unprecedented, and Dever believed the reasons given by the department were a "pretext for retaliation for [her] having 'broken the chain of command.'" (*Id.*)

On April 21, 2023, ACRD notified Coleman of the amended Charge and invited him to submit a supplemental position statement on behalf of Cottonwood. (*Id.* at 22.)

On April 25, 2023, ACRD issued a reasonable cause determination. (Doc. 13-2.)

On May 9, 2023, the Cottonwood City Council held a special meeting in part to discuss ACRD's reasonable cause determination. (Doc. 13-15 at 3-4.)

On May 24, 2023, Cottonwood entered into a conciliation agreement with Dever (Doc. 14-1 at 26-35), agreeing to pay Dever "the total sum of $67,142.92" (*id.* at 28),

1    reassign her to the position of detective (*id.* at 29), "modify its existing nondiscrimination

2    policies" (*id.*), and "conduct an interactive training by a qualified trainer for [the

3    Cottonwood Police Department's] employees, supervisors, managers, and staff" (*id.* at 30).

4    III.    <u>Plaintiff's Termination</u>

5        On May 11, 2023, two days after the City Council's May 9, 2023 meeting,

6    Defendant Rodriguez placed Plaintiff on paid administrative leave.  (Doc. 6 ¶ 19; *id.* at 43.)

7    Cottonwood then hired outside counsel, the law firm Osborn Maledon, P.A. ("OM"), to

8    investigate Plaintiff's conduct.  (Doc. 13-3.)

9        On or about September 14, 2023, following the investigation, Plaintiff's

10    employment was terminated.  (Doc. 6 ¶¶ 69, 82.)  The parties dispute the events

11    surrounding the May 9, 2023 City Council meeting and the reasons for Plaintiff's

12    termination.

13        Defendants' overarching position is as follows.  Cottonwood terminated Plaintiff's

14    employment because he behaved inappropriately and violated numerous provisions of the

15    Cottonwood Employee and Police Department policy manuals.  (Doc. 14-1 at 37-39.)

16    Cottonwood officials appropriately decided to exclude Plaintiff from the May 9, 2023

17    "executive session" where they planned to discuss ACRD's reasonable cause

18    determination.  (Doc. 6 at 41.)  Defendant Elinski, however, asked Plaintiff to remain

19    outside and be available for questioning.  (*Id.*)  "[Plaintiff] spoke to [Defendant] Elinski

20    during a break between the [City Council's] work session and the special meeting" and

21    was "irritated, agitated, angry, curt, disrespectful, and rude."  (Doc. 14-1 at 37.)  Then "[a]t

22    the conclusion of the meeting, [Plaintiff] had an interaction with [Defendant] Rodriguez

23    during which [he] expressed agitation at being excluded from the executive session.  [He

24    was] hostile and aggressive while questioning Mr. Rodriguez and ignored [Rodriguez's]

25    requests to defer the issue until the following morning.  Instead, [Plaintiff] insistently made

26    multiple requests in an angry and demeaning tone demanding that [Rodriguez] give [him]

27    answers immediately.  [Plaintiff then] visibly lost control of [his] temper and yelled at Mr.

28    Rodriguez on the street in front of the Council Chambers in the presence of other

- 4 -

employees, Council Members, and members of the Public." (*Id.* at 38.) Following this altercation, Defendant Rodriguez placed Plaintiff on administrative leave. (Doc. 6 at 39-43.) OM investigated these incidents and concluded that Plaintiff's conduct violated various city policies. (Doc. 13-3.) Cottonwood has also cited Plaintiff's conduct toward Dever as a reason for his termination: "[Plaintiff] rejected the advice of a medical professional and decided to impose an adverse employment action on a female officer based on [his] own conjecture about her medical condition." (Doc. 14-1 at 38-39.) "This decision contributed to a claim against the City which in turn violated [the] Employee Manual . . . [and] forced the City to devote significant resources to responding to the allegations of discrimination and participating in the ACRD's investigation." (*Id.* at 39.) Finally, Cottonwood has also cited Plaintiff's "combative and remorseless behavior and . . . lack of self-awareness or acceptance of any responsibility" as a reason for his termination. (*Id.*)

Plaintiff's overarching position is that he was "wrongfully terminated," without "just cause," "in retaliation for the reporting of unlawful acts." (Doc. 6 ¶¶ 39, 80-93 [alleging two counts of wrongful termination].) From Plaintiff's perspective, Defendants Elinski and Rodriguez "attempted to leverage [the ACRD] report, in order to disparage and harm the Cottonwood Police Department and [Plaintiff] in part by manipulating the City Council." (*Id.* ¶ 11.) "The ACRD Report was put on the May 9, 2023 agenda without [Plaintiff's] knowledge or input" despite Plaintiff's involvement in helping to reach a conciliation agreement with Dever. (*Id.* ¶ 12.) Before the meeting, Plaintiff "contacted two Councilmembers who were perplexed that he was not included, considering they had been given no context to the report." (*Id.* ¶ 14.) Then, after the meeting, Plaintiff "contacted Defendant Rodriguez to inquire about the reason he was excluded" and "Rodriguez admitted he and Defendant Elinski were attempting to influence the balance of the City's elected body." (*Id.* ¶¶ 17-18.) "Two days later, [Plaintiff] was placed on administrative leave by Defendant Rodriguez at the request of Defendant Elinski . . . . No reason was listed for the administrative leave at the time . . . and it appears to have been a

parting shot for past professional conflicts involving [Plaintiff]."  (*Id.* ¶¶ 19, 22.)

Plaintiff further alleges that the May 9, 2023 executive session and the ensuing investigation violated various statutory, constitutional, and common-law prohibitions. First, Plaintiff alleges that Defendants violated Arizona's open meeting laws on May 9, 2023 "by going beyond what was listed in the agenda" and by failing to provide Plaintiff with adequate notice of a meeting where they intended to discuss his employment.  (*Id.* ¶¶ 99-107.)  Second, Plaintiff alleges that Defendant Kurot defamed him by telling another City Council member "that [Plaintiff] 'threatened' Defendant Rodriguez and Defendant Elinski and had 'crossed the line.'"  (*Id.* ¶¶ 108-13.)  Third, Plaintiff alleges that Cottonwood "was required to maintain the Complaint filed by [Plaintiff] against Defendant Winkler but instead, Defendant Douglass altered that document before presenting it to Council as if it was in its original form," which violated Arizona statutes that prohibit tampering with public documents and led Plaintiff to file "a second complaint against Defendant Douglass."  (*Id.* ¶¶ 89, 94-98.)  Fourth, Plaintiff alleges that all Defendants, except Defendant Kurot, violated 42 U.S.C. § 1983 by depriving him of his constitutional right to due process and by unlawfully denying him, under color of law, his property interest in continued employment.  (*Id.* ¶¶ 114-25.)

Although Plaintiff does not name Coleman as a defendant, he suggests that Coleman acted improperly and helped facilitate certain Defendants' wrongful conduct.  (*Id.* ¶ 60 ["Blame was placed on [Plaintiff] as part of a personal vendetta by Defendants . . . facilitated by Defendants Douglass and Winkler and Mr. Coleman, resulting in his termination."].)  For example, Plaintiff asserts that Coleman may have contributed to Defendants' alleged violation of Arizona's open meeting laws.  (*Id.* ¶ 31.)  Plaintiff also contends that Coleman failed to properly advise him on the correct course of conduct regarding Dever (*see, e.g.*, *id.* ¶ 43); "never disclosed these failures to the City Council" (*id.* ¶46); and later misrepresented that "he would have advised against [Dever's transfer] if he had been consulted" (*id.* ¶ 54).  Plaintiff also alleges that Coleman helped process Plaintiff's mishandled complaint against Defendant Winkler (*id.* ¶ 40) and misrepresented

1    that the OM report did not exist (*id.* ¶ 37).

2    IV.    Procedural History

3          On April 3, 2024, Plaintiff filed a complaint in Yavapai County Superior Court.

4    (Doc. 1-1 at 3-27.)

5          On May 10, 2024, Defendants filed a notice of removal.  (Doc. 1.)

6          On May 22, 2024, Plaintiff filed his operative pleading, the First Amended

7    Complaint ("FAC") (Doc. 6).

8          On May 30, 2024, Plaintiff filed a motion to disqualify counsel.  (Doc. 8.)

9          On June 12, 2024, Defendants filed a response to Plaintiff's motion.  (Doc. 14.)[1]

10         Plaintiff declined to file a reply.

11                                   **DISCUSSION**

12   I.    Legal Standard

13         The Court "appl[ies] state law in determining matters of disqualification."  *In re*

14   *Cnty. of Los Angeles*, 223 F.3d 990, 995 (9th Cir. 2000) ("[W]e must follow the reasoned

15   view of the state supreme court when it has spoken on the issue.").  In Arizona, motions to

16   disqualify opposing counsel are "view[ed] with suspicion."  *Gomez v. Superior Court*, 717

17   P.2d 902, 905 (Ariz. 1986).  "Only in extreme circumstances should a party to a lawsuit be

18   allowed to interfere with the attorney-client relationship of his opponent."  *Alexander v.*

19   *Superior Court*, 685 P.2d 1309, 1313 (Ariz. 1984).  "[T]he moving party . . . [must] show

20   sufficient reason why an attorney should be disqualified from representing his client.

21   Whenever possible the courts should endeavor to reach a solution that is least burdensome

22   upon the client or clients."  *Id.*

23         The District of Arizona has adopted, by local rule, the Arizona Rules of Professional

24   Conduct.  *See* LRCiv 83.2(e).  Accordingly, this Court must follow those rules when

25   deciding whether to disqualify counsel.  *Unified Sewerage Agency v. Jelco Inc.*, 646 F.2d

26   1339, 1342 n.1 (9th Cir. 1981) (holding that Oregon's ethical rules governed

27   disqualification issue because "the United States District Court for the District of Oregon

28   ---
     [1]    Defendants' request for oral argument is denied because the issues are fully briefed and argument would not aid the decisional process.  *See* LRCiv 7.2(f).

has adopted as its rules the disciplinary rules of the State Bar of Oregon" but "express[ing] no opinion on the law to apply where the district court has not designated the applicable rules of professional responsibility"). *See also Quatama Park Townhomes Owners Ass'n v. RBC Real Est. Fin., Inc.*, 365 F. Supp. 3d 1129, 1136-37 (D. Or. 2019) ("When considering a motion to disqualify counsel in the Ninth Circuit, at least when a district court has adopted by local rule the ethical code governing lawyers promulgated by the state in which that court sits, federal courts are directed to apply the law of the forum state . . . ."). The Preamble to the Arizona Rules of Professional Conduct cautions that "violation of a Rule does not necessarily warrant any other nondisciplinary remedy, such as disqualification of a lawyer in pending litigation." Ariz. Sup. Ct. R. 42, Ariz. R. Pro. Conduct Preamble ¶ 20. *See also id.* ("[T]he purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons."); *Roosevelt Irr. Dist. v. Salt River Project Agr. Imp. & Power Dist.*, 810 F. Supp. 2d 929, 944 (D. Ariz. 2011) ("[D]isqualification motions should be subjected to 'particularly strict scrutiny' because of their potential for abuse.") (citation omitted).

II.    The Parties' Arguments

Plaintiff moves to disqualify PC and Counsel from representing Defendants in this matter. (Doc. 8.) Although Plaintiff's briefing is not a model of clarity, Plaintiff first appears to argue that disqualification is necessary because Coleman is a partner at PC and previously provided legal advice to Plaintiff in connection with Plaintiff's employment with Cottonwood. (*Id.* at 7-9.) More specifically, Plaintiff suggests that Coleman either (1) advised him on the reassignment decision involving Dever that ultimately led to Plaintiff's termination (*id.* at 7), or (2) knew of Plaintiff's intention to reassign Dever and failed to counsel the proper course of action (*id.* at 4-5). Second, Plaintiff argues that because PC was involved in the decision to reassign Dever and because Defendant Winkler is now employed by PC, "[PC] cannot protect its interests, its employee's interests and its client's interest as they will likely be antagonistic." (*Id.* at 9.) Plaintiff also implies in general terms that PC's past and ongoing relationship with Cottonwood interferes with its

ability to represent Defendants.  (*Id.* at 3-4.)[2]  Third, Plaintiff argues that PC cannot represent Defendants because Coleman is likely to be a necessary witness in this litigation and "the firm's involvement with the City of Cottonwood and their actions will [also be] the subject of testimony."  (*Id.* at 3, 9-10.)

Defendants oppose the disqualification motion.  (Doc. 14.)  As an initial matter, Defendants contend that Plaintiff's request "is a baseless and transparent attempt to weaponize a disqualification motion for tactical purposes" (*id.* at 1) and that the motion "does not clearly state a legal basis for any demand that PC be removed as counsel for Defendants" (*id.* at 8).  On the merits, Defendants specifically dispute that Coleman ever advised Plaintiff on the Dever reassignment (*id.* at 8-11) or that Coleman otherwise represented Plaintiff in his personal capacity (*id.* at 11-13).  Additionally, Defendants argue that "the likelihood that Coleman will be a witness is remote" (*id.* at 15); that Coleman serving as a witness would not, at any rate, require disqualification (*id.* at 15-16); that PC's representation of its current employee, Defendant Winkler, does not create a conflict of interest (*id.* at 16); and that PC's relationship with Cottonwood, and any friction in that relationship, in no way interferes with PC's ability to adequately represent Defendants (*id.* at 16-17).

III.  <u>Analysis</u>

A.  **Plaintiff As Former Client**

As noted, one of Plaintiff's disqualification theories is that PC should be disqualified because of its "involvement in the decision that became the subject of the ACRD Complaint" and because Plaintiff "had every reason to believe that Mr. Coleman was his attorney on the ACRD matter."  (Doc. 8 at 5, 8.)  This argument implicates ER 1.9, entitled "Duties to Former Clients," which provides in relevant part:

> (a)    A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse

---

[2]    Plaintiff does not explain the precise nature of these conflicts and instead cites a January 2024 newspaper article chronicling how "[PC] terminated its relationship with the City of Cottonwood" after members of the Cottonwood City Council made public statements about PC.  (Doc. 8 at 3-4.)

to the interests of the former client unless the former client gives informed consent, confirmed in writing.

. . . .

(c)    A lawyer who has formerly represented a client in a matter shall not thereafter:

(1)    use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2)    reveal information relating to the representation except as these Rules would permit or require with respect to a client.

*Id.*[3]  "For a conflict to exist pursuant to this provision, the moving party must show: (1) the existence of an attorney-client relationship; (2) that the former representation was 'the same or substantially related' to the current litigation; and (3) that the current client's interests are 'materially adverse' to the former client's interests." *Roosevelt Irr. Dist.*, 810 F. Supp. 2d at 945 (quoting *Foulke v. Knuck*, 784 P.2d 723, 726-27 (Ariz. Ct. App. 1989)). "Looking to this ethical rule as a guide, Arizona courts have noted that . . . '[o]nly in extreme circumstances should a party to a lawsuit be allowed to interfere with the attorney-client relationship of his opponent.'" *SinglePoint Direct Solar, LLC v. Curiel*, 2022 WL 17418428, *2 (D. Ariz. 2022) (quoting *Alexander*, 685 P.2d at 1313).

### 1.    Existence Of Attorney-Client Relationship

The first element of the ER 1.9 analysis is whether an attorney-client relationship existed between Plaintiff and Coleman and/or PC.  Under Arizona law, "[a]n attorney-client relationship exists when a person has manifested to a lawyer his intent that the lawyer provide him with legal services and the lawyer has manifested consent to do so." *Simms v. Rayes*, 316 P.3d 1235, 1238 (Ariz. Ct. App. 2014).  Although an express agreement is not required, "absent an express agreement, the facts must show the plaintiff believed the

---

[3]    ER. 1.10(a) further provides: "While lawyers and nonlawyers are associated in a firm, none of them shall knowingly represent a client on legal or nonlegal matters when any of them practicing alone would be prohibited from doing so by ERs 1.7 or 1.9, unless the prohibition is based on a personal interest of the prohibited lawyer or nonlawyer and does not present a significant risk of materially limiting the representation of the client by the remaining lawyers and nonlawyers in the firm."

defendant was acting as her attorney *and* that belief was 'objectively reasonable' under the circumstances." *Ranasinghe v. Popolizio*, 2015 WL 12942499, *3 (Ariz. Ct. App. 2015) (unpub.) (citing *In re Pappas*, 768 P.2d 1161, 1167-68 (Ariz. 1988)).

Applying these standards, Plaintiff has not established that he had an attorney-client relationship with Coleman and/or PC.  As a preliminary matter, there is no evidence that Plaintiff had an express agreement with Coleman or PC to establish such a relationship. Plaintiff has not submitted any documentary evidence of an agreement, nor does he allege in the FAC that he and Coleman orally agreed to representation.  The only evidence on this issue is Coleman's own declaration, which states that "I never represented [Plaintiff] in his personal capacity" and "PC has never entered into a retention agreement or engagement letter with [Plaintiff]."  (Doc. 14-1 at 20.)

Plaintiff's argument thus depends on the existence of an implied attorney-client relationship.  As for Dever's reassignment, Plaintiff alleges in the FAC that he "approved that action after seeking advice of former City Attorney Steve Horton and the Pierce Coleman law firm."  (Doc. 6 ¶ 43.)  But even assuming, without deciding, that this statement is sufficient to establish that Plaintiff subjectively believed Coleman and PC represented him, an attorney-client relationship could only arise under Arizona law if that belief was "objectively reasonable."  *Pappas*, 768 P.2d at 1167.

It was not.  The Arizona ethical rules make clear that an organization's lawyers do not automatically represent its employees.  ER 1.13(g), for example, states that "a lawyer representing an organization *may* also represent any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of ER 1.7."  *Id.* (emphasis added).  The comments to this rule contemplate a situation where "constituents" communicate with the organization's lawyer in a privileged capacity and emphasize that "[t]his does not mean . . . that constituents of an organizational client are the clients of the lawyer."  *Id.* cmt. 2.  This rule and the accompanying comments suggest that a lawyer jointly representing an organization and its employee would be the exception rather than the rule.

1    Plaintiff has not provided evidence to establish that Coleman and PC fell into this
2    exception.  As an initial matter, it is unclear whether Plaintiff even received any legal
3    advice from Coleman.  Plaintiff only alleges that he "approved [Dever's] assignment after
4    *seeking* advice of . . . the Pierce Coleman law firm."  (Doc. 6 ¶ 43.)  He does not specifically
5    allege that Coleman or anyone else at PC gave him advice, but rather complains that
6    "[t]hose Attorneys failed to advise [him]."  (*Id.*)  Later in the FAC, Plaintiff alleges that
7    "[Dever's] claims *had been* discussed via phone and email for months preceding the ACRD
8    Report *with no concerns mentioned* by Pierce Coleman attorneys."  (*Id.* ¶ 51, emphasis
9    added.)  However, in his motion, Plaintiff merely asserts that "Pierce Coleman attorneys
10   were *most likely* contacted and aware of his intent prior to the disciplinary action."  (Doc.
11   8 at 5, emphasis added.)  These equivocal remarks and the use of passive language fail to
12   establish that Plaintiff spoke directly to PC or Coleman about Dever's reassignment or that
13   anyone from PC affirmatively counseled his decision.

14   On the other side of the ledger, Defendants proffer various pieces of evidence
15   indicating that PC never consulted with Plaintiff regarding Dever's reassignment.  In the
16   exhibits attached to their response brief, Defendants include a string of emails from
17   Cottonwood to PC on June 9, 2022, seeking advice on Dever's Charge.  (Doc. 14-1 at 13-
18   18.)  Those emails were not forwarded to Coleman until June 12, 2022.  (*Id.* at 12.)  Both
19   the initial emails to PC and the later emails to Coleman were sent *after* Plaintiff had already
20   informed Dever on June 8, 2022 that he "was making the decision to bring her back to a
21   patrol function if/when she [was] cleared to return to full-duty."  (*Id.* at 10.)  Based on this
22   timeline, the Court agrees with Defendants that, at least on this record, "Coleman never
23   gave, and could not have given, advice on Dever's reassignment."  (Doc. 14 at 9.)  Plaintiff
24   had the opportunity to refute these assertions but declined to file a reply brief or submit
25   additional evidence.  If Plaintiff never spoke to Coleman before deciding on Dever's
26   reassignment, it is difficult to see how a reasonable person in his shoes would believe
27   Coleman was acting as his attorney.  *Cf. Lomas v. Maxim Healthcare Service, Inc.*, 2009
28   WL 10708531, *4 (D. Ariz. 2009) ("[Plaintiff] has further failed to produce any

documentary evidence from which an attorney-client relationship between [Plaintiff] and [opposing counsel] could be reasonably inferred.")

Although the analysis could end there, the Court also notes that even if Coleman had spoken to Plaintiff regarding the Dever reassignment, it would have been objectively unreasonable for Plaintiff to believe this interaction resulted in the formation of a personal attorney-client relationship between him and Coleman and/or PC. There is no allegation or evidence that Plaintiff paid Coleman or PC for legal services. "[W]here payment for legal services has been made it is persuasive evidence that an attorney-client relationship was established." *Foulke*, 784 P.2d at 726. Nor has Plaintiff come forward with evidence that he shared confidential information with Coleman or PC regarding Dever. *Advanced Mfg. Techs., Inc. v. Motorola, Inc.*, 2002 WL 1446953, *4 (D. Ariz. 2002) ("Other federal courts have held that a party establishes an implied attorney-client relationship if the party shows (1) that the party submitted confidential information to a lawyer, and (2) that the party did so with the reasonable belief that the lawyer was acting as the party's attorney.") (collecting cases). Plaintiff also fails to allege (let alone present evidence) that he sought legal advice from Coleman in his personal capacity regarding Dever. Courts have found that an attorney-client relationship is more likely to arise when "it is clear that the consultation was personal in nature, that [the party] was seeking, at the very least, legal information on matters pertaining to him, not to a client of his." *Foulke*, 784 P.2d at 726. To the extent Plaintiff may have spoken with Coleman or any other attorney at PC, there is no indication that those discussions were for reasons going beyond Plaintiff's official duties as the Cottonwood Chief of Police and Coleman's and PC's representation of their client, Cottonwood. *Cf. United States v. Graf*, 610 F.3d 1148, 1156-61 (9th Cir. 2010) (addressing the "special problems [that arise when] corporate officers, directors, and employees who communicate with corporate counsel on behalf of the corporation [then] later attempt to claim a personal attorney-client privilege regarding those communications" and emphasizing that "the individual's ability to claim a personal attorney-client privilege" only arises when, among other things, "the individual makes clear he or she is seeking

personal legal advice and the communications relate to personal legal affairs, not to the company's business").

Finally, Plaintiff asserts in his motion that, following the Dever reassignment, "[a]ttorney Stephen Coleman with Defendant's law firm worked with and represented Chief Gesell on the ACRD Complaint."  (Doc. 8 at 6.)  However, Plaintiff provides no evidence to support this assertion.  He does not allege in the FAC that he believed Coleman personally represented him during the ACRD investigation, nor does he attach an affidavit or any documentary evidence to bolster the reasonableness of his apparent belief that such an attorney-client relationship existed.

## 2. "Substantial Relationship" Test

Although the parties do not raise this issue in their briefs, it bears mentioning that, even if Coleman had represented Plaintiff, that representation would not qualify as "'the same or substantially related' to the current litigation."  *Roosevelt Irr. Dist.* 810 F. Supp. 2d at 945.  The "substantial relationship" test determines when an attorney should be disqualified from appearing on behalf of a former client's adversary, *Alexander*, 685 P.2d at 1315-16, and protects attorney-client relationships by promoting the "preservation of secrets and confidences communicated to the lawyer by the client," *Christensen v. U.S. Dist. Ct. for Cent. Dist. of Cal.*, 844 F.2d 694, 698 (9th Cir. 1988) (citation omitted).  Arizona law, however, presumes that there is no expectation of confidentiality between joint clients.  *Alexander*, 685 P.2d at 1314-15.  *See also* ER 1.7, cmt. 28 ("[A]s between commonly represented clients, the [attorney-client] privilege does not attach.  Hence, it must be assumed that if litigation eventuates between the clients, the privilege will not protect any such communications . . . .").  It thus follows that, in situations involving prior joint representation, the "substantial relationship" test does not apply and "[t]here is also no viable claim based on Ethical Rule 1.9."  *SinglePoint Direct Solar*, 2022 WL 17418428 at *4.

Although Plaintiff and Cottonwood did not enter into a joint-representation agreement, Plaintiff alleges that Coleman "represented" him in the exact same matters in

which Coleman also represented Cottonwood.  (*See, e.g.*, Doc. 6 ¶¶ 43, 51.)  In *Alexander*, the Arizona Supreme Court discussed the "problem of representation adverse to that of a former client" under similar circumstances.  685 P.2d at 1313-16.  There, an attorney represented a group of investors in U.S. Tax Court after a man named Alexander sold them tax shelters, which the IRS deemed invalid.  *Id.* at 1311.  Later, Alexander was accused of fraud and racketeering in connection with the sale, and his interests were determined to be adverse to at least one of the investors.  *Id.* at 1312.  Even though the court found that Alexander's attorney also had an attorney-client relationship with that investor, it ultimately declined to disqualify the attorney because "the substantial relationship test [was] not applicable" and the joint representation "[did] not involve any disclosures of confidential information."  *Id.* at 1313-16.[4]  In so holding, the *Alexander* court further noted that "there is a recognized presumption that '[a]s between joint clients ordinarily there is no expectation of confidentiality.'"  *Id.* at 1315 (citation omitted).[5]  *See also Nitrini v. Feinbaum*, 501 P.2d 576, 582 (Ariz. Ct. App. 1972) ("When two or more clients employ the same attorney in the same business, communications made by them in relation to such business are not privileged inter sese nor are they privileged as between any one of the parties and the attorney.") (internal quotation marks omitted).  This interpretation is supported by the fact that Arizona courts have generally characterized the duties owed to former clients (embodied by ER 1.9) as rooted in confidentiality.  *See, e.g.*, *Nitrini*, 501 P.2d at 582 ("The principle which bars an attorney from representing an interest adverse to that of a former client is said to be grounded upon the confidential relationship which exists

---

[4]      *See also SinglePoint Direct Solar, LLC*, 2022 WL 17418428 at *2 ("Although the Arizona Supreme Court was interpreting the old Arizona Ethical Rules in *Alexander*, it did discuss the then Model Rule 1.9 stating '[w]e believe our holding in the present case meets both sections of Rule 1.9.'") (quoting *Alexander*, 685 P.2d at 1316).

[5]      *Alexander* also cited, with approval, *Petty v. Superior Ct. In & For Los Angeles Cnty.*, 253 P.2d 28, 34 (Cal. App. Ct. 1953).  There, a California appellate court found no confidential communication where the client being jointly represented did not assert the confidentiality of the information given out of the presence of the other client.  *See id.*  Here too, Plaintiff has not asserted that he divulged confidential information to Coleman and instead seems concerned about confidential information Coleman may have gleaned from other sources.  (Doc. 8 at 10 ["[I]t presents an unfair advantage if Pierce Coleman knows of evidence that supports Plaintiff but then claims privilege as current counsel."].)

between attorney and client, and courts take the position that by imposing[sic] this disability upon the attorney, confidential information is protected."); *Bicas v. Superior Court*, 567 P.2d 1198, 1201 (Ariz. Ct. App. 1977) (same); *Nichols v. Elkins*, 408 P.2d 34, 39 (Ariz. Ct. App. 1965) ("[T]he foundation of disqualification [from representing an interest adverse to that of a former client] is the existence of a former confidential relationship.").

Here, there is no reason to believe that any communications between Plaintiff and Coleman would be confidential as to Defendants. All Defendants were involved in addressing the Charge in varying degrees. And there is no indication that Plaintiff gave Coleman information that would have been shielded from Defendants had they been jointly represented. As such, "the substantial relationship test is not applicable," *Alexander*, 685 P.2d at 1316, and ER 1.9 has not been violated. *See also SinglePoint Direct Solar*, 2022 WL 17418428 at *4 ("[W]hen an attorney who jointly represent clients withdraws from the representation of the secondary client and subsequently sues that client on behalf of the primary client, there is no violation of Rule 1.9."); *Nichols*, 408 P.2d at 39 ("[W]hen two or more clients employ the same attorney in the same business, communications made by them in relation to such business are not privileged inter sese nor are they privileged as between any one of the parties and the attorney. . . . Since these communications are not deemed confidential, there is no impediment to or impropriety in the adverse representation by the attorney."). This finding also makes sense from a practical standpoint, as it is difficult to see how Plaintiff would be prejudiced by Counsel sharing any prior communications between Plaintiff and Coleman with Defendants if Defendants already knew about those communications.

For these reasons, Coleman would not be disqualified from participating in the present litigation under ER 1.9. Because Coleman would not be disqualified, Counsel and PC are likewise not disqualified under ER 1.10(a). *See also Amparano v. ASARCO, Inc.*, 93 P.3d 1086, 1094 (Ariz. Ct. App. 2004) ("[L]ogic dictates that, if Shanker is not disqualified, there can be no imputed disqualification of the associated firm.").

- 16 -

1

      **B.**    **Conflict Of Interest: Current Clients**

2            Plaintiff argues that "[PC] cannot protect its interests, its employee's interests and

3 its client's interest as they will likely be antagonistic." (Doc. 8 at 9.) More specifically,

4 Plaintiff suggests that PC has a conflict of interest with Defendant Winkler because she is

5 now an employee of the firm and her past conduct, while employed by Cottonwood, has

6 been called into question. (*Id.* at 3, 7.) Plaintiff further argues that PC itself has a conflict

7 of interest because Coleman was involved in the alleged violation of the open meeting laws

8 and supported the allegedly unlawful termination decision. (*Id.* at 5, 8.) Last, Plaintiff

9 contends that PC may have a conflict of interest with Cottonwood because members of the

10 Cottonwood City Council previously made derogatory statements about PC and PC

11 publicly terminated its representation of the city. (*Id.* at 3-4.)

12            In response, Defendants argue that "Plaintiff's argument that PC's employment of

13 [Defendant] Winkler creates a conflict is illogical" because, if that were the case, a

14 company's in-house counsel would always be disqualified in disputes that involved a

15 former employee. (Doc. 14 at 16.) Defendants also contend that PC only terminated its

16 representation of Cottonwood with regard to its work as "interim City attorney" after "a

17 small minority of council members made misrepresentations about PC" and PC has

18 continued to represent Cottonwood "in employment matters." (*Id.* at 16-17.) Defendants

19 then argue that PC's decision to end its representation of Cottonwood as the interim city

20 attorney "does not impact the firm's ability to effectively represent and defend the City's

21 interests in this litigation." (*Id.* at 17.) Defendants also avow that "the City and the

22 individual Defendants have all consented to, and wish for, PC's representation in this

23 matter." (*Id.*)

24            ER 1.7, which is entitled "Conflict of Interest: Current Clients," provides:

25      (a)     Except as provided in paragraph (b), a lawyer shall not represent a
client if the representation involves a concurrent conflict of interest.

26                A concurrent conflict of interest exists if:

27            (1)     the representation of one client will be directly adverse to
another client; or

28            (2)     there is a significant risk that the representation of one or more

> clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
>
> (b)    Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if each affected client gives informed consent, confirmed in writing, and:
>
> (1)    the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
>
> (2)    the representation is not prohibited by law; and
>
> (3)    the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal.

*Id.*  "A conflict of interest will be found to exist 'if there is a significant risk that a lawyer's ability to consider, recommend or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests.'" *Jamieson v. Slater*, 2006 WL 3421788, *6 (D. Ariz. 2006) (quoting ER 1.7, cmt. 8).  "In such a situation, the conflict effectively forecloses alternatives that would otherwise be available to the client." *Id.* (internal citation omitted).

Plaintiff has not come close to establishing the existence of a significant risk that Counsel will be unable to effectively represent Defendants.  Beyond a few conclusory statements in his brief, Plaintiff does very little to articulate how PC's interests might be adverse to Defendants' and how those interests might "effectively foreclose alternatives that would otherwise be available to the clients." *Id.*  Although ER 1.0(o) explains that "Personal interests," when used in reference to conflicts of interest, include but are not limited to "the probity of a lawyer's own conduct, or the conduct of a nonlawyer in the firm, in a transaction," the personal interests of Coleman and Defendant Winkler at issue here do not create the type of conflict that is automatically imputed to other members of the firm.  ER 1.10(a) ("While lawyers and nonlawyers are associated in a firm, none of them shall knowingly represent a client on legal or nonlegal matters when any one of them practicing alone would be prohibited from doing so by ERs 1.7 or 1.9, *unless the prohibition is based on a personal interest of the prohibited lawyer or nonlawyer . . . .*")

- 18 -

(emphasis added). Such conflicts based on "personal interest" are only imputed to other members of the firm if they "present a significant risk of materially limiting the representation of the client." *Id.* "The lawyer's representation is 'materially limited' if the prohibited lawyer's personal interests would adversely affect the associated lawyer's loyalty to the client or threaten the confidentiality of information." *In re Alexander*, 300 P.3d 536, 545 (Ariz. 2013) (citation omitted). Because Plaintiff has not explained how Defendant Winkler's and Coleman's potential liability would impede Counsel's loyalty to Defendants, he has not shown that disqualification is warranted.

Further, it should be noted that "[t]he purpose of [ER 1.7(a)(2)] . . . is to protect a *current client* from material limitation in *its* representation, caused by its lawyer's responsibilities to another client, a former client, or a third person." *Roosevelt Irr. Dist.*, 810 F. Supp. 2d at 976. Plaintiff does not allege that he and Counsel have a current attorney-client relationship. (*See generally* Doc. 6.) He is not, in other words, the party this rule is meant to protect. *Roosevelt Irr. Dist.*, 810 F. Supp. 2d 976 ("Arvin and Cooper are not Derouin's current clients, and therefore they simply are not the parties meant to be protected by this rule."). This concern, if it exists, belongs to Defendants, none of whom have voiced any concern with Counsel's continued representation. *See also E.E.O.C. v. Luby's, Inc.*, 347 F. Supp. 2d 743, 746 (D. Ariz. 2004) (noting that the current client is "the only party that must worry about whether her representation will be limited" by her lawyer's responsibilities to a third party).

C.    **Lawyer As Witness**

Plaintiff argues that "Mr. Coleman will be a key witness to the main issue in this case, and advised Chief Gesell on the very matter for which he was terminated." (Doc. 8 at 7.) Plaintiff further argues that "it is well documented that Mr. Coleman was present during various discussions with the City Counsel and likely others who made the decision to terminate Chief Gesell." (*Id.* at 3.) In addition, Plaintiff contends that "[t]he firm's involvement with the City of Cottonwood and their actions will [also be] the subject of testimony in this case." (*Id.*)

In response, Defendants argue that "the likelihood that Coleman will be a witness is remote.  Any testimony he could provide is either privileged or irrelevant." (Doc. 14 at 15.)  In addition, Defendants argue that "Rule 3.7 permits other lawyers in the firm to act as advocates even if one member of the firm is a witness" and "the entire rule contains an exception where disqualification would be a substantial hardship on the client." (*Id.*)  Thus, Defendants argue that "[t]here is no conflict for the law firm to ethically continue to represent Defendants" and "no support for Plaintiff's theory that Coleman's alleged status as a potential witness requires disqualification of the entire firm." (*Id.* at 15-16.)

ER 3.7, which is entitled "Lawyer as Witness," provides:

(a)    A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:

　　(1)    the testimony relates to an uncontested issue;

　　(2)    the testimony relates to the nature and value of legal services rendered in the case; or

　　(3)    disqualification of the lawyer would work substantial hardship on the client.

(b)    A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by ER 1.7 or ER 1.9.

*Id.*

As an initial matter, Plaintiff's motion concerns Coleman as a potential witness, not potential testimony by Defendants' actual counsel of record, Justin S. Pierce and Joseph D. Estes.  Under ER 3.7(b), "[a] lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by ER 1.7 or ER 1.9."  Plaintiff does not argue that Counsel themselves are likely to be called as witnesses, and for the reasons outlined above, Counsel are not disqualified under ER 1.7 or 1.9.  Thus, under ER 3.7(b), they may permissibly represent Defendants even if Coleman is likely to be called as a witness.

Although the analysis could end there, Plaintiff's disqualification attempt based on Coleman's status as a potential witness also fails for other reasons.  A motion for

disqualification under ER 3.7 must be supported by a showing that the attorney is a "necessary witness." *Sec. Gen. Life Ins. Co. v. Superior Court*, 718 P.2d 985, 988 (Ariz. 1986). "[T]here is a dual test for 'necessity.' First the proposed testimony must be relevant and material. Then it must also be unobtainable elsewhere." *Id.* Plaintiff has not established that Coleman qualifies as a "necessary witness" under these standards. Even assuming that Coleman's testimony would be admissible and material (which is not clear from the record), Plaintiff has failed to show that his testimony could not be obtained from other witnesses, such as Plaintiff himself, Defendants, or the other members of Cottonwood City Council.[6] A mere showing that counsel is a potential, but not necessary, witness is insufficient to trigger disqualification. *Cramton v. Grabbagreen Franchising LLC*, 2020 WL 6680366, *3 (D. Ariz. 2020).

Yet another reason why Plaintiff's motion fails is that disqualification is warranted only where "the testimony is or may be prejudicial to the testifying attorney's client." *Powers Reinforcing Fabricators, L.L.C. v. Contes*, 473 P.3d 714, 721 (Ariz. Ct. App. 2020). "The prejudice requirement . . . works to preclude the folly of an attorney giving testimony detrimental to the interest he is advocating as well as to prevent opposing counsel from contriving some tactical need for calling the attorney thereby triggering disqualification." *Id.* at 722 (citation omitted). Although "a party can easily be prejudiced when opposing counsel acts as both advocate and witness," "the obvious dangers inherent in [disqualifying counsel because an adverse party intends to call him as a witness] and the importance of the right to have the counsel of one's choice require careful scrutiny of the facts before such a result is permitted." *Sec. Gen. Life Ins.*, 718 P.2d at 988. Plaintiff does not directly address the issue of prejudice in his motion. Although he asserts that "it presents an unfair advantage if Pierce Coleman knows of evidence that supports Plaintiff but then claims privilege as current counsel" (Doc. 8 at 10), this potential harm does not directly relate to Coleman testifying as a witness. Without more concrete allegations of

---

[6]    Indeed, Plaintiff appears to concede that this same evidence might be available elsewhere: "Mr. Coleman was present during various discussions with the City Counsel and *likely others who made the decision* to terminate [Plaintiff]." (Doc. 8 at 3, emphasis added.)

prejudice, Plaintiff's arguments do not satisfy the high bar required for disqualification.

Finally, "even when the other factors are present, a lawyer should withdraw *only after* it becomes clear an attorney ought to testify." *Powers Reinforcing Fabricators*, 473 P.3d at 722 (internal quotation marks omitted).  At this early stage of proceedings, it is far from clear that Coleman will testify or that there will even be a trial.  *See also Sec. Gen. Life Ins.*, 718 P.2d at 988 ("A party's mere declaration of an intention to call opposing counsel as a witness is an insufficient basis for disqualification even if that counsel could give relevant testimony.").[7]

Accordingly, the Court declines to disqualify Counsel based on ER 3.7.

D.    **Sanctions**

Defendants ask the Court to "issue the maximum sanctions available under the law." (Doc. 14 at 17.)  They argue that "the numerous misrepresentations throughout Plaintiff's Motion clearly demonstrate that it is frivolous and merely an attempt to interfere with Defendants' attorney-client relationship." (*Id.* at 7.)  Defendants also contend that Plaintiff's motion is a "transparent attempt to weaponize a disqualification motion for tactical purposes" (*id.* at 1) and that "this Court should issue sanctions against Plaintiff for disclosing doubly protected information in contravention of both Arizona open meeting law and the attorney-client privilege" (*id.* at 15).

The Court has the inherent authority to sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees.  *Goodyear Tire & Rubber Co. v. Haeger*, 581 U.S. 101, 103-04 (2017) ("[S]uch an order is limited to the fees the innocent party incurred solely because of the misconduct . . . .").  Additionally, Rule 11 "allows a court to award

---

[7]    Plaintiff only cites one case, *Romley v. Arpaio*, 40 P.3d 831 (Ariz. Ct. App. 2002), to support his contention that Coleman's status as a potential witness creates a conflict of interest.  (Doc. 8 at 6.)  In *Romley*, the "Factual and Procedural History" portion of the opinion includes the notation that "[b]ecause Gerberry intended to call the Maricopa County Attorney as a witness before the Commission, the County Attorney had a conflict of interest in representing the Sheriff before the Commission in this matter."  *Id.* at 833. However, the opinion contains no analysis as to whether disqualification was, in fact, immediately required under ER 3.7 under those circumstances.

sanctions where a party makes a frivolous filing or where a party files a pleading or paper for an improper purpose." *Adriana Int'l Corp. v. Thoeren*, 913 F.2d 1406, 1415 (9th Cir. 1990). "A filing is frivolous if no competent attorney would believe it was well-grounded in fact and warranted by law." *Id.*

Sanctions are not warranted here under either standard. Although poorly developed, Plaintiff's arguments for relief were non-frivolous given the close relationship between PC and Cottonwood, the past interactions between Plaintiff and Coleman, and the personal involvement of two current PC attorneys in the facts underlying the litigation. Moreover, Defendants can only speculate that the motion was made in bad faith or for an improper purpose. Finally, as for Defendants' argument that Plaintiff should be sanctioned for disclosing allegedly confidential and privileged information, that issue is not yet ripe. Defendants more fully briefed the issue of improper disclosure in their still-pending motion to dismiss (Doc. 13 at 31-33), but Plaintiff has not yet responded to that motion.

Accordingly,

**IT IS ORDERED** that Plaintiff's motion to disqualify Defendants' counsel (Doc. 8) is **denied**.

**IT IS FURTHER ORDERED** that Plaintiff must respond to Defendants' pending motion to dismiss. (Doc. 13.) The response is due within 14 days of the issuance of this order.

Dated this 5th day of December, 2024.

_____
Dominic W. Lanza
United States District Judge

- 23 -