**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephen Gesell, | No. CV-24-08090-PCT-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| City of Cottonwood, et al., | |
| Defendants. | |

Stephen Gesell ("Plaintiff"), the former Chief of Police of the City of Cottonwood ("Cottonwood"), has sued Cottonwood and assorted current and former Cottonwood officials (collectively, "Defendants") for wrongful termination, defamation, due process violations, and various statutory infractions. (Doc. 6.) Now pending before the Court is Defendants' motion to dismiss and to strike certain allegations. (Doc. 13.) For the reasons that follow, Defendants' motion is granted and Plaintiff is granted leave to amend.

## RELEVANT BACKGROUND

I.    Factual Allegations

The following facts, presumed true, are derived from Plaintiff's operative pleading, the First Amended Complaint ("FAC"), and the documents attached thereto. (Doc. 6.)

Plaintiff is the former Cottonwood Chief of Police. (*Id.* ¶¶ 69, 82.)

At all times relevant to this litigation, Tim Elinski ("Elinski") was the Mayor of Cottonwood, Jesus "Rudy" Rodriguez ("Rodriguez") was the Deputy City Manager, Scotty Douglass ("Douglass") was the City Manager, Jennifer Winkler ("Winkler") was the City

1   Attorney, Amanda Wilber ("Wilber") was the City's Human Resources Manager, and
2   Helaine Kurot ("Kurot") was a City Council member. (*Id.* ¶¶ 3-8.) These individuals will
3   be collectively referred to as the "Individual Defendants."

4       "Beginning in May of 2023, [Elinski] and [Rodriguez] attempted to leverage an
5   Arizona Civil Rights Division discrimination report ('ACRD Report'), in order to
6   disparage and harm the Cottonwood Police Department and [Plaintiff] in part by
7   manipulating the City Council." (*Id.* ¶ 11.) The ACRD Report concerned the conduct of
8   Plaintiff and other Cottonwood officials toward non-party Kiedi Dever ("Detective
9   Dever"). (*Id.* at 28-37.) Detective Dever filed a charge of discrimination against
10  Cottonwood, in part because Plaintiff reassigned her to the position of patrol officer
11  following a five-month extended leave of absence. (*Id.* at 36-37 n.2.) "Steve Horton, the
12  former City Attorney, had sought direction from [Plaintiff], and they had agreed to enter
13  conciliation." (*Id.* ¶ 12.) Nevertheless, "[t]he ACRD Report was put on the [City
14  Council's] May 9, 2023 agenda without [Plaintiff's] knowledge or input" (*id.*) and "Elinski
15  had instructed Defendant Rodriguez to exclude [Plaintiff] from the May 9, 2023 meeting"
16  (*id.* ¶ 13). "Rodriguez sent an email to [Wilber] one hour prior to the meeting and
17  instructed her to attend and to tell [Plaintiff] he was not permitted in the meeting." (*Id.*
18  ¶ 15.) However, before the meeting started, "Elinski asked [Plaintiff] if he would be
19  available to answer questions at the executive session . . . [and] misled [Plaintiff] and the
20  Council by acting as if he wanted [Plaintiff] to be included in the executive session." (*Id.*
21  ¶ 16.) Ultimately, "[e]ven though there were protests of multiple Council members,
22  [Plaintiff] was not allowed to join." (*Id.* ¶ 17.)

23      Plaintiff alleges that "[t]he Executive Session resulted in numerous statutory
24  violations due to the content of that session." (*Id.* ¶ 30.) "[S]everal Cottonwood Police
25  Department sworn managers were discussed and maligned without cautionary restraint"
26  and "[t]he discussion ended with the assertion that the agency had cultural and behavioral
27  issues that necessitated corrective action." (*Id.* ¶ 28.) Plaintiff alleges that, by having these
28  discussions at a closed meeting, "Defendants violated the laws on Executive Sessions by

going beyond what was listed in the agenda for all employees" and by discussing Plaintiff's employment while failing to provide him "with written notice" at least 24 hours before the meeting.  (*Id.* ¶¶ 100-01.)  "The preclusion of [Plaintiff] from this session [also] eliminated the ability for [Plaintiff] to challenge the false claims and correct the information discussed during the meeting."  (*Id.* ¶ 29.)

"[A]fter the meeting, [Plaintiff] contacted Defendant Rodriguez to inquire about the reason he was excluded" and "Defendant Rodriguez admitted he and Defendant Elinski were attempting to influence the balance of the City's elected body.  Defendant Elinski also admitted this plan in an email authored later that week stating he did not want [Plaintiff] to 'insert himself' into the discussion, despite the fact that the session involved the ACRD Report."  (*Id.* ¶¶ 17-18.)

On May 11, 2023, Plaintiff "was placed on administrative leave by Defendant Rodriguez at the request of Defendant Elinski and it was later learned that Defendant Elinski told Defendant Rodriguez to fire [Plaintiff].  No reason was listed for the administrative leave at the time."  (*Id.* ¶ 19.)  However, Kurot later told "Councilmember Duvemay outside the normal process for Council meetings, that [Plaintiff] 'threatened' Defendant Rodriguez and Defendant Elinski and [Plaintiff] had 'crossed the line.'"  (*Id.* ¶ 64.)

After being placed on administrative leave, Plaintiff received a Notice of Investigation ("NOI") from Cottonwood.  (*Id.* at 45-46.)  The NOI informed him that "[t]his investigation relates to your alleged conduct on May 9, 2023" and "[y]ou are alleged to have been hostile and aggressive when questioning Mr. Rodriguez about your exclusion" from the City Council meeting.  (*Id.* at 45.)

Cottonwood then hired a law firm, Osborn Maledon ("OM"), to investigate Plaintiff's conduct.  (*Id.* ¶ 35.)  During the investigation, Plaintiff "provided input which was ignored," including "a summary of the chronology of [relevant] events . . . and a list of suggested questions relevant to an objective investigation."  (*Id.*)  During severance negotiations with Cottonwood, Plaintiff asked to see a copy of OM's investigative report

but was informed by Cottonwood's representative that "'there is no report' though it has been determined that the investigation was completed weeks earlier." (*Id.* ¶ 37.) "The report that was eventually released . . . was not based on facts, clearly framing a false narrative," and "did not contain any just cause to terminate [Plaintiff]." (*Id.* ¶¶ 38-39.) OM also failed to interview at least one important witness. (*Id.* ¶ 66.)

While these events were taking place, "Winkler recklessly sent [Plaintiff] the audio of the May 9th Executive Session . . . .  This disclosure resulted in Defendant Winkler exposing the City to liability and likely violated A.R.S. § 38-510 (a), a class 1 misdemeanor." (*Id.* ¶¶ 31-32.)  "[I]nstead of admitting to releasing the recording, [Winkler] began to bully [Plaintiff] and his family about the disclosure and attempted to conceal, minimize, and deflect her actions." (*Id.* ¶ 30.)

On July 21, 2023, Plaintiff "filed a retaliatory complaint against Defendant Winkler with the Human Resources Director, Defendant Wilber, and Defendant Douglass." (*Id.* ¶¶ 33, 87.)  However, Plaintiff later "discovered that Defendant Douglass had altered [the] complaint against Defendant Winkler by removing the ten-page email attachment and his notations from a singular PDF document, rescanning the document, and then sending the altered Complaint to the Council as if it were in the original form." (*Id.* ¶ 41.)  "Wilber and Winkler were aware of the alteration and failed to notify the Council." (*Id.* ¶ 96.)

On August 29, 2023, Plaintiff filed a second complaint against Douglass "about the failure to address the complaint regarding Defendant Winkler and the discovery of Defendant Douglass' subsequent surreptitious alteration of the complaint." (*Id.* ¶ 89.)

On September 7, 2023, about one week later, Plaintiff received a "letter of intent to terminate" from Cottonwood. (*Id.* ¶ 61.)  One of the reasons given for his termination was the ACRD Report and "that [Plaintiff] 'discriminated' against a 'female detective.'" (*Id.* ¶¶ 52, 61.)  However, "[t]he ACRD report was . . . not included in notice of investigation nor mentioned as a concern in [OM's] investigation or findings." (*Id.* ¶ 68.)  As a result, Plaintiff "was not given an opportunity to respond or refute this false allegation prior to the Notice of Intent to Terminate." (*Id.* ¶¶ 62, 82.)

1    "At no time before or during the four months [Plaintiff] was on administrative leave
2    was the ACRD Report referenced as a concern."  (*Id.* ¶ 62.)  Instead, Cottonwood's
3    attorneys "repeatedly only referenced [Plaintiff's] tone of voice when speaking to
4    Defendant Rodriguez as the justification for termination," and one of Cottonwood's
5    retained attorneys "repeatedly indicated [Plaintiff's] role in the ACRD Report was based
6    entirely on an obscure ADA technicality." (*Id.* ¶¶ 42, 63.)

7    On September 14, 2023, "Plaintiff was notified of his termination."  (*Id.* ¶ 69.)
8    "Douglass was the City Manager who terminated [Plaintiff] and stated it was his decision
9    because [Plaintiff] served at the pleasure of the 'City Manager.'" (*Id.* ¶ 83.)  "Pursuant to
10    A.R.S. § 38-1106, [Plaintiff] timely appealed the decision."  (*Id.* ¶ 69.)    However,
11    "Douglass stated that [Plaintiff] was not entitled to an appeal because he was the Chief of
12    Police." (*Id.* ¶ 70.)

13    Plaintiff alleges that "Wilber was fully aware Chief Gesell was being terminated for
14    false cause" even though "she herself concurred with the action that resulted in the ACRD
15    ADA technical violation along with the City Manager and attorneys.  She was also aware
16    of the egregious procedural errors violating [Plaintiff's] statutory rights," but "[r]ather than
17    fulfill her role in protecting employee rights, [she] aided the other Defendants by helping
18    to facilitate [Plaintiff's] wrongful termination."  (*Id.* ¶¶ 71-72.)

19    Plaintiff alleges the real reason he was terminated was in retaliation for reporting
20    statutory violations committed by Defendants.  (*Id.* ¶¶ 75-76, 91.)    "As a result of
21    Defendants' actions, Plaintiff has been damaged.  His ability to run for public office, obtain
22    employment in his field, or secure contracting work via his consulting business following
23    his highly successful 34-year law enforcement career has now been irreparably harmed due
24    to the actions of the Defendants."  (*Id.* ¶ 79.)

25    II.    Procedural History

26    On April 3, 2024, Plaintiff filed a complaint in Yavapai County Superior Court.
27    (Doc. 1-1 at 3-27.)

28    On May 10, 2024, Defendants filed a notice of removal.  (Doc. 1.)   The sole

1   jurisdictional basis for removal was that the complaint asserted a federal claim under

2   42 U.S.C. § 1983.  (*Id.* ¶ 5.)  Due to the presence of federal-question jurisdiction over this

3   claim, Defendants asserted that the Court also "has supplemental jurisdiction over the state

4   law causes of action."  (*Id.*)

5        On May 22, 2024, after the parties met and conferred (Doc. 4), Plaintiff filed the

6   FAC.  (Doc. 6.)  It asserts two state-law claims against Cottonwood for wrongful

7   termination (Counts One and Two); a state-law claim against Cottonwood, Douglass,

8   Wilber, and Winkler for "Tampering With Public Records" (Count Three); a state-law

9   claim against all Defendants for violating Arizona's "Open Meeting Laws" (Count Four);

10  a state-law claim against Kurot for defamation (Count Five); and a claim against all

11  Defendants except Kurot under 42 U.S.C. § 1983 (Count Six).  (*Id.* ¶¶ 80-126.)

12       On May 30, 2024, Plaintiff moved to disqualify Defendants' counsel.  (Doc. 8.)

13       On June 10, 2024, Defendants filed the pending motion to dismiss.  (Doc. 13.)  The

14  Court then stayed the briefing schedule on the motion to dismiss pending the resolution of

15  the disqualification motion.  (Doc. 16.)

16       On December 6, 2024, the Court denied the disqualification motion.  (Doc. 17.)  The

17  motion to dismiss later became fully briefed (Docs. 18, 19) and neither side requested oral

18  argument.

**DISCUSSION**

19

20  I.   Count Six

21       The only federal claim asserted in the FAC is Count Six, which is denominated as

22  a "42 U.S.C. § 1983 Civil Rights violation including under *Monell*."  In Count Six, Plaintiff

23  alleges that all Defendants except Kurot violated his "constitutional rights under the United

24  States' [sic] Constitution, Fourteenth Amendments [sic] and Ariz. Const. art. II, § 4 as to

25  procedural due process and substantive due process as well as violated his rights under

26  Arizona statutes as set forth herein.  The conduct shocks the conscience depriving Plaintiff

27  of a property interest, employment, as well as violated procedural and statutory rights."

28  (Doc. 6 ¶ 115.)  Later, the FAC elaborates: "Defendants violated [Plaintiff's] rights under

A.R.S. § 38-1101 et seq. by not providing him the required notice of the investigation, the proper notice and ability to appear at the 'Executive Session,' the appeal remedy as authorized by statute, and/or due process under state and/or federal law.  They further violated his rights when they failed to comply with A.R.S. § 38-431.03 by going beyond the stated purpose and notice."  (*Id.* ¶ 119.)

Defendants move to dismiss Count Six on various grounds.  (Doc. 13 at 8-22.) Because, as discussed in later portions of this order, the propriety of this Court's continued exercise of jurisdiction over this action depends on the viability of Count Six, the analysis begins there.

### A.    **Legal Standard**

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party."  *Id.* at 1144-45 (citation omitted).  However, the court need not accept legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.* at 678.  The court also may dismiss due to "a lack of a cognizable legal theory."  *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

### B.    **Required Elements To Prevail On Count Six**

To determine whether Count Six states a claim, it is necessary to identify what Plaintiff must prove to prevail on Count Six.  The FAC indicates that Count Six is a claim premised on the violation of Plaintiff's constitutional rights "to procedural due process and substantive due process" (Doc. 6 ¶ 115) and Plaintiff confirms in his response brief that he

is pursuing both due-process theories (Doc. 18 at 9-12).

1.    Procedural Due Process

In the FAC and again in his response to the motion to dismiss, Plaintiff sometimes appears to suggest that if Defendants violated any state-law procedural requirements related to his termination, it follows that he may pursue a claim against them under 42 U.S.C. § 1983 premised on the violation of his procedural due process rights.  As Defendants correctly note in their motion, this approach is misplaced.  (*See, e.g.*, Doc. 13 at 17 [arguing that "Plaintiff improperly conflates constitutional due process with the procedural requirements of the POBOR" and that "state procedural requirements are not synonymous with the protections of the Constitution"].)

"A procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017).

State law is relevant when it comes to the first element, as "[a] government employee has a constitutionally protected property interest in continued employment when the employee has a legitimate claim of entitlement to the job.  Laws, rules or understandings derived from independent sources such as state law create such claims of entitlement." *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993) (citation omitted).  *See also Roybal*, 871 F.3d at 931 ("Property interests are not created by the Constitution, instead they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.") (cleaned up); *United States v. Guillen-Cervantes*, 748 F.3d 870, 872 (9th Cir. 2014) ("To state a prima facie substantive or procedural due process claim, one must, as a threshold matter, identify a liberty or property interest protected by the Constitution.  The Constitution itself creates no property interests; rather, such interests are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.") (cleaned up).  As discussed in more detail below, Defendants contend that Plaintiff lacked any legitimate claim of entitlement to his job as Cottonwood's Chief of Police because it

was an at-will position.  Plaintiff's theory is that the Arizona Peace Officer Bill of Rights ("POBOR") gave him a legitimate claim of entitlement to his position because the POBOR, following a 2022 amendment by the Arizona legislature, precludes at-will employment agreements for peace officers in Arizona.

Although state law provides an important role when evaluating the first element of a procedural due process claim, the second element poses "a question of federal, not state, law." *Roybal*, 871 F.3d at 933.  This is because "[f]ederal due process does not necessarily entitle a plaintiff to the same procedures provided by state law.  Rather, under federal law, what process is due is determined by context, to be analyzed in accordance with the three-part balancing test described in [*Mathews v. Eldridge*, 424 U.S. 319 (1976)]." *Id.*  Under that test, "[t]o satisfy federal due process minimums, . . . employees need only receive notice and an opportunity for a hearing before being deprived of their property interest." *Id.*  Thus, in *Roybal*, the Ninth Circuit held that the district court erred by determining that the plaintiff "did not receive due process because [his employer] violated state law" by reducing his salary without holding "a predeprivation probable cause hearing," explaining that the employee "received all the process due to him" under federal law because he received notice and an opportunity to be heard before the final decision regarding his salary reduction. *Id.* at 933-34.  The court emphasized that although state law "provides greater protection than federal law," "the district court erred in resting its analysis on a violation of state law." *Id.*

### 2.    Substantive Due Process

"To establish a substantive due process claim, a plaintiff must, as a threshold matter, show a government deprivation of life, liberty, or property." *Nunez v. City of Los Angeles*, 147 F.3d 867, 871 (9th Cir. 1998).  In addition, the government deprivation must "shock the conscience or offend the community's sense of fair play and decency." *Rosenbaum v. Washoe Cnty.*, 663 F.3d 1071, 1079 (9th Cir. 2011) (cleaned up).  It is not enough for a plaintiff to allege that defendants engaged in "arbitrary or capricious conduct that violates state law" or deprived him of his "right to work or to pursue a livelihood." *DeGroote v.*

*City of Mesa*, 2009 WL 485458, *4 (D. Ariz. 2009).  Instead, "[t]he protections of substantive due process have for the most part been accorded to matters relating to marriage, family, procreation, and the right to bodily integrity.  These fields likely represent the outer bounds of substantive due process protection."  *Nunez*, 147 F.3d at 871 n.4 (cleaned up).

C.     **Analysis**

1.     Procedural Due Process—The Individual Defendants

The Individual Defendants seek dismissal of the procedural due process component of Count Six for an array of reasons, including that they are "qualifiedly immune" because "the alleged denial of due process is not clearly established."  (Doc. 13 at 21.)

"Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011).  Courts "have discretion to address the 'clearly established' prong of the qualified immunity test first; if [they] conclude that the relevant law was not clearly established, [they] need not address the other prong concerning the underlying merits of the constitutional claim."  *Shooter v. Arizona*, 4 F.4th 955, 961 (9th Cir. 2021) (internal quotation marks omitted).  The Court will exercise its discretion to begin with the clearly established prong here because, as discussed below, it is dispositive.

A government official's conduct violates clearly established law when "the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right."  *Ashcroft,* 563 U.S. at 741 (cleaned up).  Although there need not be a "case directly on point," "existing precedent must have placed the statutory or constitutional question beyond debate."  *Id.*  In other words, the case law must "have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law."  *Shafer v. Cnty. of Santa Barbara*, 868 F.3d 1110, 1117 (9th Cir.

2017).  *See also Kisela v. Hughes*, 584 U.S. 100, 104 (2018) ("This Court has repeatedly told courts—and the Ninth Circuit in particular—not to define clearly established law at a high level of generality.") (cleaned up); *Sharp v. Cnty. of Orange*, 871 F.3d 901, 910-11 (9th Cir. 2017) ("The Supreme Court has repeatedly instructed that we examine whether the violative nature of particular conduct is clearly established by controlling precedent, not whether the conduct violates a general principle of law. . . .  Except in the rare case of an obvious instance of constitutional misconduct . . . , Plaintiffs must identify a case where an officer acting under similar circumstances as defendants was held to have violated the [Constitution].  In other words, Plaintiffs must point to prior case law that articulates a constitutional rule specific enough to alert these [defendants] in this case that their particular conduct was unlawful.") (cleaned up).

"Determining claims of qualified immunity at the motion-to-dismiss stage raises special problems for legal decision making.  On the one hand, we may not dismiss a complaint making a claim to relief that is plausible on its face.  But on the other hand, defendants are entitled to qualified immunity so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  The Supreme Court has emphasized that this is a low bar, explaining that qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Keates v. Koile*, 883 F.3d 1228, 1234-35 (9th Cir. 2018) (cleaned up).

As noted, the first element of Plaintiff's procedural due process claim requires him to show that he had a constitutionally protected property interest in his continued employment as Chief of Police.  *Roybal*, 871 F.3d at 931.  At first blush, Plaintiff would seem to lack such an interest, because Cottonwood's municipal code expressly provides that the position of Chief of Police is an at-will position: "The police chief shall be appointed by and shall serve at the pleasure of the city manager."  Cottonwood City Code § 2.44.030.  "Where state employees serve at the will of the appointing authority, . . . there is no such reasonable expectation of continued employment, and thus no property right"

1  that could support a procedural due process claim. *Brady v. Gebbie*, 859 F2d 1543, 1548

2  (9th Cir. 1988).

3  The wrinkle here arises from the POBOR. "Initially passed in 2014, the POBOR

4  provides certain protections to certified peace officers in Arizona. These protections are

5  primarily procedural and include protection during an internal investigation, notice and

6  opportunity to be heard before termination of employment, and an opportunity for a post-

7  termination appeal." *Blunt v. Town of Gilbert*, 2024 WL 2722167, *3 (D. Ariz. 2024). "In

8  its original form, the statute . . . allowed law enforcement agencies and their employees to

9  enter into employment agreements that supplanted, revised, or otherwise deviated from the

10  terms of the POBOR without causing an issue." *Id.* Thus, under the original version of

11  the POBOR enacted in 2014, nothing would have prevented Cottonwood from adhering to

12  its municipal code, treating Plaintiff's position of Chief of Police as an at-will position, and

13  not providing Plaintiff with notice and an opportunity to be heard (as well as the other

14  procedural rights contemplated in the statute) before terminating him. However, "in 2022,

15  the Legislature amended" the POBOR to "explicitly set the floor of minimum rights that

16  peace officers are granted in Arizona. It also removed the ability for law enforcement

17  agencies and their employees to 'supplant, revise, or otherwise deviate from' the statute.

18  Instead, the statute now only allows them to 'supplement or enhance' the terms of the

19  POBOR." *Id.* "This amendment became effective on September 24, 2022." *Id.*

20  In a nutshell, Plaintiff's position is that even though he was hired before the

21  September 24, 2022 effective date of the POBOR amendment,[1] he became entitled to all

22  of the procedural rights created by the amendment once it went into effect—and, thus, he

23  had a legitimate claim of entitlement to his job of Chief of Police at the time of his

24  termination in September 2023. (Doc. 18 at 3, 9 [arguing that "[t]he claim that POBOR

25  does not convey any property interest is baseless" and that "POBOR did and does create a

26

27  ―――――――――――――
[1]      Although the record does not reveal exactly when Plaintiff was hired as Chief of
Police, Defendants correctly note that the FAC's references to "Plaintiff's conduct as Chief

28  of Police in June 2022" show that the hiring necessarily occurred before September 24,
2022. (Doc. 13 at 14 n.5, citing Doc. 6 ¶¶ 26, 45, 56.)

1   property interest as certain requirements are set forth in statute"].)  Plaintiff also notes that,

2   in certain documents, Cottonwood seemed to acknowledge that the additional protections

3   created by the 2022 amendment were applicable to him.  (*Id.* at 8.)  Meanwhile, Defendants

4   argue that the 2022 amendment could not, as a matter of state law, apply retroactively to

5   modify Plaintiff's at-will employment and that the Contracts Clauses of the United States

6   and Arizona Constitutions would, at any rate, prevent the 2022 amendment from impairing

7   Plaintiff's implied contract with the City.  (Doc. 13 at 13-17.)

8          This is not the first case to consider a procedural due process-based § 1983 claim

9   premised on the 2022 POBOR amendment.  In *Blunt*, the Town of Gilbert terminated one

10  of its police officers in September 2023 and the officer responded by asserting a variety of

11  claims against the town, including "violation of his procedural . . . due process rights under

12  the . . . POBOR [and] violation of the POBOR itself."  *Blunt*, 2024 WL 2722167 at *1.

13  When addressing the procedural due process claim, the district court began by considering

14  "the threshold issue [of] whether Plaintiff Blunt has a constitutionally protected property

15  interest."  *Id.* at *2.  As in this case, the town argued the plaintiff lacked a protected property

16  interest because he was an at-will employee when he was originally hired and "the

17  presumption against retroactivity, along with the Contract Clauses of both the United States

18  and Arizona Constitutions, prohibit the retroactive application of the amended POBOR to

19  Plaintiff."  *Id.*  After conducting a thorough analysis of the issue, the district court agreed

20  with the town that "[t]he 2022 amendment does not retroactively apply to the agreement or

21  preempt the employment agreement between Plaintiff Blunt and the Town.  Accordingly,

22  because Plaintiff Blunt lacks a constitutionally protected interest in his employment, Count

23  I will be dismissed with prejudice."  *Id.* at *5.

24         Although Defendants urge the Court to find that *Blunt* was correctly decided and to

25  determine that the 2022 POBOR amendment was inapplicable to Plaintiff (Doc. 13 at 14-

26  15; Doc. 19 at 4, 7-8), it is unnecessary to go that far in resolving the Individual Defendants'

27  request for qualified immunity.  As noted, if a court "conclude[s] that the relevant law was

28  not clearly established, [it] need not address the other prong concerning the underlying

merits of the constitutional claim." *Shooter*, 4 F.4th at 961. "The plaintiff bears the burden of pointing to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular conduct was unlawful." *Hughes v. Rodriguez*, 31 F.4th 1211, 1223 (9th Cir. 2022) (cleaned up). The necessity of identifying a prior case with similar facts is particularly pronounced in the context of procedural due process claims. *Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 983 (9th Cir. 1998) ("[T]he law regarding procedural due process claims can rarely be considered clearly established at least in the absence of closely corresponding factual and legal precedent."). Additionally, "the prior precedent must be 'controlling'—from the Ninth Circuit or Supreme Court—or otherwise be embraced by a 'consensus' of courts outside the relevant jurisdiction." *Sharp*, 871 F.3d at 911 (citation omitted). *See also Tuuamalemalo v. Greene*, 946 F.3d 471, 477 (9th Cir. 2019) ("The right must be settled law, meaning that it must be clearly established by controlling authority or a robust consensus of cases of persuasive authority.").

In responding to the Individual Defendants' qualified immunity arguments, Plaintiff simply reiterates his belief that they violated his constitutional and statutory rights and argues that other, unrelated statutory violations show "there was no mistake." (Doc. 18 at 14-15.) Plaintiff makes no effort to identify a prior case from the Supreme Court or the Ninth Circuit (or a robust consensus of other persuasive cases) that would have imparted notice to the Individual Defendants at the time of their challenged conduct that Plaintiff had a protected property interest in his position as the Cottonwood Chief of Police by virtue of the 2022 amendment to the POBOR. Indeed, no case had addressed that issue at the time of the challenged conduct and the only subsequent decision seems to undermine, rather than support, Plaintiff's position.[2] Under these circumstances, the Individual

---

[2]    The Court acknowledges that there are some factual differences between this case and *Blunt*, but it is unnecessary to decide—at least for purposes of evaluating the Individual Defendants' entitlement to qualified immunity—whether those factual differences would compel a different outcome here on the merits of the property-interest issue. The point is that there was (and is) no clearly established law supporting Plaintiff's proposed understanding of how the 2022 POBOR amendment would apply to him.

1   Defendants are entitled to qualified immunity on Plaintiff's procedural due process claim.

2   *Cf. Lane v. City of Tucson*, 2025 WL 18682, *15 (D. Ariz. 2025) (granting qualified

3   immunity in a § 1983 action involving a former police officer's claim that the individual

4   defendants violated his procedural due process rights when demoting him, where the

5   plaintiff's position was that the POBOR "provides him with a protected property interest

6   in his municipal police captain position," because the applicability of the statute to the

7   plaintiff was "not clear" and the plaintiff failed to "reference[] any Arizona court that has

8   considered the question").

9                    2.    Procedural Due Process—Cottonwood

10      Although the Individual Defendants are entitled to qualified immunity as to the

11  procedural due process component of Count Six, Plaintiff could still prevail on that claim

12  against Cottonwood if his procedural due process rights had, in fact, been violated (and it

13  was only the absence of clearly established law that prevented the Individual Defendants

14  from being held individually liable).  *Brandon v. Holt*, 469 U.S. 464, 473 (1985) ("[A]

15  municipality is not entitled to the shield of qualified immunity from liability under

16  § 1983.");  *Horton by Horton v. City of Santa Maria*, 915 F.3d 592, 603-04 (9th Cir. 2019)

17  ("Our qualified immunity determination with respect to Officer Brice rests solely on the

18  'clearly established' law prong; we do not reach the question of whether Officer Brice's

19  actions gave rise to a constitutional violation.  A municipality may be liable if an individual

20  officer is exonerated on the basis of the defense of qualified immunity, because even if an

21  officer is entitled to immunity a constitutional violation might still have occurred.")

22  (cleaned up).

23      "To state a claim under § 1983, a plaintiff must allege the violation of a right secured

24  by the Constitution and laws of the United States, and must show that the alleged

25  deprivation was committed by a person acting under color of state law."  *West v. Atkins*,

26  487 U.S. 42, 48 (1988).  A "person" includes local government entities.  *Monell v. Dep't*

27  *of Soc. Servs. of the City of New York*, 436 U.S. 658, 690 (1978).  However, "a municipality

28  cannot be held liable under § 1983 on a *respondeat superior* theory."  *Id.* at 691.  Instead,

"[a] section 1983 plaintiff may establish municipal liability in one of three ways. First, the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity. Second, the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy. . . . Third, the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (cleaned up).

Defendants argue that any *Monell* claim against Cottonwood fails because "Plaintiff's Complaint is devoid of any facts even remotely suggesting that the City has a policy or custom of violating employees' rights under the Due Process Clause" and "Plaintiff has not alleged any facts demonstrating that the individual Defendants had the authority to create personnel policies regarding terminations/due process, as required to qualify as a final policymaker under Ninth Circuit precedent." (Doc. 13 at 9.) Defendants also contend that "Plaintiff's failure to establish that Elinski, Rodriguez, Winkler, Douglass, and/or Wilber qualify as final policymakers is unsurprising, as only the City Council possesses such authority" and "the City Council has adopted policies requiring that non-probationary, classified employees be afforded due process when terminated." (*Id.* at 11.) Last, Defendants argue that even though Elinski was Mayor, "he cannot, as a matter of law, act independently of the council as a whole. The City Council may only create policy through a majority vote at a properly noticed, formal council meeting." (*Id.* at 11-12 n.3, citing A.R.S. § 38-431.01(A).)

In response, Plaintiff first accuses Defendants of applying the wrong test for determining municipal liability. (Doc. 18 at 6 [summarizing Defendants' arguments and asserting: "That is not the test here."].) According to Plaintiff, although "*Monell* recognized one way to plead a Section 1983 claim against a governmental entity," it is also

possible to plead such a claim by showing "(1) that the Defendants were acting under color of law; (2) that the deprivation complained of was a right or interest secured by the federal constitution or laws; (3) that the deprivation complained of was intentional or the reasonably foreseeable result of a voluntary act or omission and (4) that the injury alleged was proximately caused by the defendant(s)." (*Id.* at 7, citations omitted.) Alternatively, Plaintiff argues that he has sufficiently pleaded a claim under *Monell* because he "set forth the claims that the Mayor, City Attorney, City Manager and City Council itself, the policy maker per the Defendants, were directly involved in the termination process thus ratifying it." (*Id.* at 8.) In a similar vein, Plaintiff argues that the "City was well aware of what the employees and agents were doing" and that because "the Mayor, City Manager, City Attorney and City Council were involved in the process and decision, the actions represented official policy." (*Id.* at 16.)

In reply, Defendants argue that Plaintiff "misses the relevant analysis. A final policymaker must have committed or ratified the challenged act. Here, the alleged violation is the denial of due process . . . [and Plaintiff] avoids confronting the core issue of whether any defendant with policy-making authority denied him the right to notice and an appeal." (Doc. 19 at 3-4.) Defendants reiterate that "none of the individual Defendants had the authority to create City policies regarding terminations/due process, as required to qualify as a final policymaker," that the City Council alone qualifies as a final policymaker, and that Plaintiff has failed to allege that the City Council "act[ed] with a majority vote through a properly noticed meeting" as required by Arizona law. (*Id.* at 4.)

Defendants have the better of these arguments. As a preliminary matter, Plaintiff is incorrect insofar as he appears to argue that the liability standard articulated in *Monroe v. Pape*, 365 U.S. 167 (1961), governs municipal liability in § 1983 actions. The Supreme Court in *Monroe* stated that "we are of the opinion that Congress did not undertake to bring municipal corporations within the ambit of [§ 1983]." *Id.* at 187. Meanwhile, *Monell* later clarified that "municipalities [cannot] be held liable unless action *pursuant to official municipal policy* of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691

(emphasis added). It remains settled law that a municipality is not automatically liable under § 1983 for the actions of its employees and agents. *See, e.g.*, *Long v. Cnty. of Los Angeles*, 442 F.3d 1178, 1185 (9th Cir. 2006) ("A municipality may not be sued under § 1983 solely because an injury was inflicted by its employees or agents.")

Turning to the sufficiency of the FAC, Plaintiff has not alleged any facts that plausibly suggest Cottonwood had an official policy of violating employees' procedural due process rights. Plaintiff's attempt to establish the existence of such a policy is based on a single conclusory allegation—that because "the Mayor, City Manager, City Attorney and City Council were involved in the process and decision, the actions represented official policy." (Doc. 6 ¶ 122; Doc. 18 at 16.) But this sort of allegation is insufficient—Plaintiff "has not directed us to any policy, officially adopted and promulgated by the City." *Delia v. City of Rialto*, 621 F.3d 1069, 1082 (9th Cir. 2010), *abrogated on other grounds by Filarsky v. Delia*, 566 U.S. 377 (2012).

Nor does the FAC allege sufficient facts to support liability under a "practice or custom" theory. "[L]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). *See also Delia*, 621 F.3d at 1082 ("Nor has [plaintiff] established a practice, so permanent and well-settled so as to constitute a custom, that existed and through which Chief Wells acted in [taking the challenged action]."). All that is alleged here is an isolated incident involving Plaintiff—there is no suggestion (let alone well-pleaded allegation) of other similar incidents involving other municipal employees.

The FAC's allegations are also insufficient under a "final policymaker" theory. "[W]hether a particular official has 'final policymaking authority' is a question of *state law*." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (emphasis in original). Federal courts consider "the relevant legal materials, including state and local positive law, as well as 'custom or usage' having the force of law." *Jett v. Dallas Indep. Sch. Dist.*, 491

U.S. 701, 737 (1989). As noted, the FAC's single allegation on this point is conclusory, amounting to little more than a "[t]hreadbare recital[] of the elements of a cause of action." *Mollett*, 795 F.3d at 1065. Plaintiff has not made any attempt to identify any provision of state or municipal law that plausibly suggests the Mayor, City Manager, or City Attorney wielded final policymaking authority with respect to the challenged due process violations at issue here. Nor has Plaintiff responded to Defendants' argument that those actors cannot act independently of the City Council, which "may only create policy through a majority vote at a properly noticed, formal council meeting." (Doc. 13 at 11-12 n.3.) *Cf. Glynn v. City of El Mirage*, 2023 WL 6795080, *5 (D. Ariz. 2023) ("The City Code makes clear that the Council has the authority to enact and modify personnel policies.").[3] For example, even though the Cottonwood City Code states that the Chief of Police serves at the pleasure of the City Manager (Doc. 13 at 13), this type of arrangement does not automatically establish that the City delegated final policymaking authority to the City Manager or that the City Manager is a final policymaker when it comes to compliance (or lack thereof) with employment-related procedural requirements created by the City Council. *See, e.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 479, 483 n.12 (1986) ("[T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. . . . [I]f county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board."); *Gillette*, 979 F.2d at 1349-50 (rejecting *Monell* claim against municipality in § 1983 action brought by firefighter who claimed he was suspended from his employment in retaliation for

---

[3] Defendants also cite provisions of the Cottonwood employee manual in an attempt to show that the Mayor, City Manager, and City Attorney could not be final policymakers. (Doc. 13 at 11, citing Doc. 13-12). In response, Plaintiff accuses Defendants of engaging in "an impermissible attempt to establish as 'facts' matters that are in dispute." (Doc. 18 at 5.) Because Defendants do not explain why the employee manual is a proper subject of judicial notice, the Court declines to consider it.

exercising his First Amendment rights, where one of the plaintiff's theories was that "Fire Chief Hall was . . . a 'policymaker' whose individual decision could be attributed to the City under *Monell* . . . [because] Hall had final authority with respect to disciplining fire fighters and had been delegated de facto authority to establish personnel policy within the Fire Department," because "the Eugene City Charter and ordinances grant authority to make City employment policy only to the City Manager and the City Council"); *Delia*, 621 F.3d at 1083 ("This argument confuses final decisionmaking authority with final policymaking authority.").

Finally, there are no well-pleaded allegations in the FAC suggesting that the City Council ratified the challenged procedural due process violations at issue here. As noted, the FAC's only allegation on this point is that the "City Council [was] involved in the [termination] process and decision." (Doc. 6 ¶ 122.) But ratification "requires an official policymaker make a deliberate choice from among various alternatives to follow a particular course of action." *Gillette*, 979 F.2d at 1348. "[A] policymaker [must] approve a subordinate's decision *and the basis for it* before the policymaker will be deemed to have ratified the subordinate's discretionary decision." *Id.* Thus, where a plaintiff merely alleges that the relevant municipal policymaker "did not overrule a discretionary [employment] decision" by another municipal official, this "cannot form the basis of municipal liability under section 1983." *Id.* "To hold cities liable under section 1983 whenever policymakers fail to overrule the unconstitutional discretionary acts of subordinates would simply smuggle *respondeat superior* liability into section 1983 law . . . . We decline to endorse this end run around *Monell*." *Id.*

Because the FAC's allegations are insufficient under *Monell* to state a procedural due process claim against Cottonwood, that portion of Count Six is dismissed.[4]

---

[4]      The Court acknowledges that if Defendants are correct about the disputed property-interest issue identified (but not resolved on the merits) in Part I.C.1 above, this would provide an alternative basis for dismissing Count Six as to Cottonwood. Nevertheless, "a longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." *Lyng v. Northwest Indian Cemetery Protective Ass'n*, 485 U.S. 439, 445 (1988). The Court thus finds it is prudent to limit the scope of its analysis here to the sufficiency of the FAC's allegations regarding *Monell* liability. If necessary, the Court will resolve the unresolved constitutional issue at

### 3.    Substantive Due Process—All Defendants

Having dismissed the portion of Count Six premised on the alleged violation of Plaintiff's right to procedural due process under the Fourteenth Amendment, all that remains is the portion of Count Six premised on the alleged violation of Plaintiff's right to substantive due process under the Fourteenth Amendment.[5]

Defendants argue that "Plaintiff has failed to identify the nature of the purported [substantive due process] violation.  Instead, he relies on vague and conclusory allegations that lump together multiple defendants and claims and are devoid of any factual support . . . ."  (Doc. 13 at 18.)  Defendants highlight one such instance where Plaintiff alleges: "Defendants violated Plaintiff's constitutional rights under the United States Constitution, Fourteenth Amendments and Ariz. Const. art. II, § 4 as to procedural due process and substantive due process . . . .  The conduct shocks the conscience depriving Plaintiff of a property interest, employment, as well as violated procedural and statutory rights."  (*Id.*, citing Doc. 6 ¶ 115.)  Defendants argue that these allegations are "the same kind of 'unadorned, the-defendant-unlawfully-harmed-me accusations' that the Supreme Court found deficient in *Iqbal*."  (*Id.* at 19.)

Plaintiff's response is, in many respects, non-responsive.  Plaintiff does not address Defendants' argument directly and instead appears to suggest that Defendants' decision to treat him as an at-will employee and ignore his procedural rights under the POBOR violated his right to substantive due process.  (Doc. 18 at 11-12.)  In subsequent portions of his brief, Plaintiff also appears to suggest that his substantive due process claim is supported by allegations that the Individual Defendants either misled him or withheld information from him.  (*Id.* at 12-14.)

In reply, Defendants argue that "Plaintiff's Response includes no explanation of

a later stage of this case.

[5]    To the extent Plaintiff suggests his § 1983 claim in Count Six may be based on violations of state rather than federal law (Doc. 6 ¶ 115 ["Defendants violated Plaintiff's constitutional rights under . . . Ariz. Const. art. II, § 4 . . . [and] under Arizona statutes as set forth herein"]), Plaintiff is mistaken.  *Ybarra v. Bastian*, 647 F.2d 891, 892 (9th Cir. 1981) ("Only federal rights, privileges, or immunities are protected by [§ 1983].  Violations of state law alone are insufficient.").

1    why Defendants' alleged conduct was so contrary to the fundamental principles of law that
2    Count Six clears the exceptionally high 'shocks the conscience' standard enunciated by the
3    Ninth Circuit.  Nor does Plaintiff explain why Defendants' actions approach the outer
4    bounds of substantive due process protection, which is typically limited only to matters
5    relating to marriage, family, procreation, and the right to bodily integrity."  (Doc. 19 at 7,
6    cleaned up.)  According to Defendants, "[t]he Court should decline Plaintiff's invitation to
7    'expand the concept of substantive due process,' particularly where courts in other
8    employment cases have declined to do so."  (*Id.*, citations omitted.)

9          It is unnecessary to differentiate between the Individual Defendants and
10   Cottonwood when analyzing the substantive due process component of Count Six because
11   it fails to state a claim as to all of them.  As noted, "[t]he protections of substantive due
12   process have for the most part been accorded to matters relating to marriage, family,
13   procreation, and the right to bodily integrity.  These fields likely represent the outer bounds
14   of substantive due process protection."  *Nunez*, 147 F.3d at 871 n.4 (cleaned up).  Plaintiff
15   has not explained how Defendants' challenged conduct "shocks the conscience" in the
16   manner required to support a substantive due process claim, nor has he cited any cases that
17   remotely support his position.  As Defendants note, courts in the Ninth Circuit have
18   repeatedly declined to extend substantive due process protections to cases based on
19   employment.  *See, e.g.*, *Aleman v. Cnty. of Los Angeles*, 2024 WL 5257028, *6 (C.D. Cal.
20   2024); *Fuentes v. Cnty. Of Santa Cruz*, 2023 WL 2528328, *3 (D. Ariz. 2023) (rejecting
21   substantive due process claim asserted by Arizona police officer who sought to challenge
22   his termination: "This is not a substantive due process case."); *Hanford Exec. Mgmt. Emp.
23   Ass'n v. City of Hanford*, 2014 WL 334200, *22 (E.D. Cal. 2014).

24   II.    The Remaining Claims

25         Defendants also seek the dismissal of Plaintiffs' state-law claims in Counts One,
26   Two, Four, and Five and to strike portions of the FAC that contain references to material
27   purportedly considered confidential under state law.

28         The Court finds it unnecessary to reach the merits of those arguments (at least for

now) because "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 n.7 (1988); *see also* 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a [pendent state-law claim] if . . . the district court has dismissed all claims over which it has original jurisdiction."). Here, the parties all appear to be Arizona citizens (Doc. 6 ¶¶ 2-8) and Defendants did not, at any rate, rely on diversity jurisdiction when removing this action from Yavapai County Superior Court— instead, the sole basis for removal was the presence of federal-question jurisdiction over Plaintiff's § 1983 claim, which in turn conferred supplemental jurisdiction over the remaining state-law claims (Doc. 1 ¶ 5). Now that Count Six has been dismissed, the Court may, in its discretion, decline to continue exercising supplemental jurisdiction over the remaining claims.

The *Cohill* factors counsel against retaining supplemental jurisdiction here. First, this case is less than a year old and no trial date has been set, so declining jurisdiction will cause minimal duplication of effort. *Cf. Fitzhugh v. Miller*, 2020 WL 1640495, *9 (D. Ariz. 2020) (concluding the same for a less-than-a-year-old case). Second, it appears the Yavapai County Superior Court is at least as convenient a forum as this Court. *Cf. Shooter v. Arizona*, 2019 WL 2410808, *8 (D. Ariz. 2019), *aff'd*, 4 F.4th 955 (9th Cir. 2021) (concluding the same under similar circumstances). As to the remaining factors, considerations of fairness, federalism, and comity are best served by allowing the Arizona state courts to address state-law claims (as well as the dispute over whether the challenged paragraphs of the FAC should be considered confidential under state law). *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law."); *see also Roundtree v. Atl. Dev. & Inv.*, 2009 WL 2132697, *3 (D. Ariz. 2009) (dismissing federal claim and then

declining to exercise supplemental jurisdiction over remaining state-law claims: "The Court is mindful that the exercise of supplemental jurisdiction may serve the values of judicial economy and convenience . . . but these values are outweighed by the interests of comity and federalism.") (cleaned up); *Floyd v. Watkins*, 2015 WL 5056036, *6 (D. Or. 2015) ("The Court closely examined the sole federal law claim [under § 1983] and resolved it in favor of Officer Watkins. State court is a convenient forum for the parties, and declining to exercise supplemental jurisdiction respects the values of federalism and comity.").

Accordingly, Counts One through Five are dismissed without prejudice. *Cohill*, 484 U.S. at 350 ("When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.").[6]

III.    Leave To Amend

Plaintiff seeks leave to amend in the event of dismissal. (Doc. 18 at 20-21.) In reply, Defendants argue that "leave to amend should be denied" because all of Plaintiff's claims, including Count Six, "suffer from incurable flaws." (Doc. 19 at 11.)

Rule 15(a) of the Federal Rules of Civil Procedure "advises the court that 'leave [to amend] shall be freely given when justice so requires.'" *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (citation omitted). "This policy is 'to be applied with extreme liberality.'" *Id.* (citation omitted). Thus, leave to amend should be granted unless "the amendment: (1) prejudices the opposing party; (2) is sought in bad faith;

---

[6]    "[I]n some circumstances a remand of a removed case involving pendent claims will better accommodate these values [of economy, convenience, fairness, and comity] than will dismissal of the case." *Cohill*, 484 U.S. at 351. Nevertheless, the Court concludes, in its discretion, that dismissing the state-law claims without prejudice is preferable to remanding them to Yavapai County Superior Court. *Edmondson & Gallagher v. Alban Towers Tenants Ass'n*, 48 F.3d 1260, 1267 (D.C. Cir. 1995) ("Whether to remand or dismiss is a matter normally left to the discretion of the district court."). This is because Plaintiff is being granted leave to amend as to Count Six. Remanding the state-law claims to Yavapai County Superior Court at this juncture would thus create a possibility of inefficient, duplicative litigation in multiple forums.

(3) produces an undue delay in litigation; or (4) is futile." *AmerisourceBergen Corp. v. Dialysist W., Inc.*, 465 F.3d 946, 951 (9th Cir. 2006).

As applied to Count Six, Plaintiff's request for leave to amend is granted in part and denied in part. More specifically, leave to amend is granted as to the portion of Count Six that seeks to assert a procedural due process claim pursuant to § 1983, because it may be possible for Plaintiff to allege additional facts to cure the deficiencies identified in the qualified immunity and/or *Monell* analyses set forth above. However, leave to amend is denied, on futility grounds, as to the portion of Count Six that seeks to assert a substantive due process claim pursuant to § 1983 or a § 1983 claim premised on violations of state law.

Finally, as for Counts One through Five (which, as discussed in Part II above, have been dismissed without prejudice due to the absence, at least for now, of a federal claim), Plaintiff may reassert those claims if he chooses to take advantage of the limited grant of leave to amend as to Count Six set forth above. In that scenario, Defendants may simply reassert their dismissal arguments as to Counts One, Two, Four, and Five in their response to the next iteration of Plaintiff's complaint, and if the amended Count Six survives dismissal, the Court will take up the merits of Counts One, Two, Four, and Five at that time.

…

…

…

…

…

…

…

…

…

…

…

Accordingly,

**IT IS ORDERED** that:

1.     Defendants' motion to dismiss (Doc. 13) is **granted**.

2.     Within 14 days of the issuance of this order, Plaintiff may file a second amended complaint ("SAC").  The changes shall be limited to attempting to cure the deficiencies that led to the dismissal of the procedural due process component of Count Six.  Plaintiff also may reassert Counts One through Five if he chooses to file a SAC.

3.     If Plaintiff does not file a SAC within 14 days of the issuance of this order, the Clerk shall enter judgment accordingly and terminate this action.

Dated this 27th day of March, 2025.

Dominic W. Lanza
United States District Judge