**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Stephen Gesell, | No. CV-24-08090-PCT-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| City of Cottonwood, et al., | |
| Defendants. | |

Stephen Gesell ("Plaintiff"), the former Chief of Police of the City of Cottonwood ("Cottonwood"), has sued Cottonwood and assorted current and former Cottonwood officials for wrongful termination, defamation, due process violations, and various statutory infractions. In March 2025, the Court dismissed Plaintiff's sole federal claim—a due process claim under 42 U.S.C. § 1983—and declined to continue exercising supplemental jurisdiction over Plaintiff's remaining state-law claims. (Doc. 20.) However, the Court also granted Plaintiff leave to amend as to his § 1983 claim, and Plaintiff has now filed an amended pleading in an attempt to cure the deficiencies identified in the dismissal order. (Doc. 21.) Defendants have, in turn, filed another motion to dismiss. (Doc. 25.) For the reasons that follow, the motion is granted, the § 1983 claim is dismissed without leave to amend, and Plaintiff's remaining state-law claims are remanded to the Yavapai County Superior Court.

…

…

**RELEVANT BACKGROUND**

I.    <u>Factual Allegations</u>

The following facts, presumed true, are derived from Plaintiff's operative pleading, the Second Amended Complaint ("SAC"), and the documents attached thereto.  (Doc. 21; Doc. 21-1; Doc. 24 [notice of errata].)

Plaintiff is the former Cottonwood Chief of Police.  (Doc. 21 ¶¶ 11, 69, 82.)

At all times relevant to this litigation, Tim Elinski ("Elinski") was the Mayor of Cottonwood, Jesus "Rudy" Rodriguez ("Rodriguez") was the Deputy City Manager, Scotty Douglass ("Douglass") was the City Manager, Jennifer Winkler ("Winkler") was the City Attorney, Amanda Wilber ("Wilber") was the City's Human Resources Manager, and Helaine Kurot ("Kurot") was a City Council member.  (*Id.* ¶¶ 3-8.)  These individuals will be collectively referred to as the "Individual Defendants."

"Beginning in May of 2023, [Elinski] and [Rodriguez] attempted to leverage an Arizona Civil Rights Division discrimination report ('ACRD Report'), in order to disparage and harm the Cottonwood Police Department and [Plaintiff] in part by manipulating the City Council."  (*Id.* ¶ 11.)  The ACRD Report concerned the conduct of Plaintiff and other Cottonwood officials toward non-party Kiedi Dever ("Detective Dever").  (Doc. 21-1 at 2-11.)  Detective Dever filed a charge of discrimination against Cottonwood, in part because Plaintiff reassigned her to the position of patrol officer following a five-month extended leave of absence.  (*Id.* at 10-11 n.2.)  "Steve Horton, the former City Attorney, had sought direction from [Plaintiff], and they had agreed to enter conciliation."  (Doc. 21 ¶ 12.)  Nevertheless, "[t]he ACRD Report was put on the [City Council's] May 9, 2023 agenda without [Plaintiff's] knowledge or input" (*id.*), and "Elinski had instructed Defendant Rodriguez to exclude [Plaintiff] from the May 9, 2023 meeting" (*id.* ¶ 13).  "Rodriguez sent an email to [Wilber] one hour prior to the meeting and instructed her to attend and to tell [Plaintiff] he was not permitted in the meeting."  (*Id.* ¶ 15.)  However, before the meeting started, "Elinski asked [Plaintiff] if he would be available to answer questions at the executive session . . . [and] misled [Plaintiff] and the

- 2 -

1    Council by acting as if he wanted [Plaintiff] to be included in the executive session."  (*Id.*

2    ¶ 16.)   Ultimately, "[e]ven though there were protests of multiple Councilmembers,

3    [Plaintiff] was not allowed to join." (*Id.* ¶ 17.)

4        Plaintiff alleges that "[t]he Executive Session resulted in numerous statutory

5    violations due to the content of that session."  (*Id.* ¶ 30.)  "[S]everal Cottonwood Police

6    Department sworn managers were discussed and maligned without cautionary restraint,"

7    and "[t]he discussion ended with the assertion that the agency had cultural and behavioral

8    issues that necessitated corrective action." (*Id.* ¶ 28.)  Plaintiff alleges that, by having these

9    discussions at a closed meeting, "Defendants violated the laws on Executive Sessions by

10   going beyond what was listed in the agenda for all employees" and by discussing Plaintiff's

11   employment while failing to provide him "with written notice" at least 24 hours before the

12   meeting. (*Id.* ¶¶ 100-01.)  "The preclusion of [Plaintiff] from this session [also] eliminated

13   the ability for [Plaintiff] to challenge the false claims and correct the information discussed

14   during the meeting." (*Id.* ¶ 29.)

15       "[A]fter the meeting, [Plaintiff] contacted Defendant Rodriguez to learn the reason

16   he was excluded," and "Rodriguez admitted he and Defendant Elinski were attempting to

17   influence the balance of the City's elected body.  Defendant Elinski also admitted this plan

18   in an email authored later that week stating he did not want [Plaintiff] to 'insert himself'

19   into the discussion, despite the fact that the session involved the ACRD Report."  (*Id.*

20   ¶¶ 17-18.)

21       On May 11, 2023, Plaintiff "was placed on administrative leave by Defendant

22   Rodriguez at the request of Defendant Elinski and it was later learned that Defendant

23   Elinski told Defendant Rodriguez to fire [Plaintiff].   No reason was listed for the

24   administrative leave at the time." (*Id.* ¶ 19.)  However, Kurot later told "Councilmember

25   Duvernay outside the normal process for Council meetings, that [Plaintiff] 'threatened'

26   Defendant Rodriguez and Defendant Elinski and [Plaintiff] had 'crossed the line.'"

27   (*Id.* ¶ 64.)

28       After being placed on administrative leave, Plaintiff received a Notice of

Investigation ("NOI") from Cottonwood.  (Doc. 21-1 at 19-20.)  The NOI informed him that "[t]his investigation relates to your alleged conduct on May 9, 2023," and "[y]ou are alleged to have been hostile and aggressive when questioning Mr. Rodriguez about your exclusion" from the City Council meeting.  (*Id.* at 19.)  The NOI also stated, "**you have specific rights** and responsibilities in this investigation in accordance with ARS 38-1102." (*Id.*)

Cottonwood then hired a law firm, Osborn Maledon ("OM"), to investigate Plaintiff's conduct.  (Doc. 21 ¶ 35.)  During the investigation, Plaintiff "provided his input which was ignored," including "a summary of the chronology of [relevant] events . . . and a list of suggested questions relevant to an objective investigation."  (*Id.*)  The investigation by OM also "followed POBAR [sic] procedures for part of the investigation including but not limited to warnings about rights."  (*Id.* ¶ 121.)  During severance negotiations with Cottonwood, Plaintiff asked to see a copy of OM's investigative report, but he was informed by Cottonwood's representative that "'there is no report' though it has been determined that the investigation was completed weeks earlier."  (*Id.* ¶ 37.)  "The report that was eventually released . . . was not based on facts, clearly framing a false narrative," and "did not contain any just cause to terminate [Plaintiff]."  (*Id.* ¶¶ 38-39.)  OM also failed to interview at least one important witness.  (*Id.* ¶ 66.)

While these events were taking place, "Winkler recklessly sent [Plaintiff] the audio of the May 9th Executive Session . . . .  This disclosure resulted in Defendant Winkler exposing the City to liability and likely violated A.R.S. § 38-510 (a), a class 1 misdemeanor."  (*Id.* ¶¶ 31-32.)  "[I]nstead of admitting to releasing the recording, [Winkler] began to bully [Plaintiff] and his family about the disclosure and attempted to conceal, minimize, and deflect her actions."  (*Id.* ¶ 30.)

On July 21, 2023, Plaintiff "filed a retaliatory complaint against Defendant Winkler with the Human Resources Director, Defendant Wilber, and Defendant Douglass."  (*Id.* ¶¶ 33, 87.)  However, Plaintiff later "discovered that Defendant Douglass had altered [the] complaint against Defendant Winkler by removing the ten-page email attachment and his

notations from a singular PDF document, rescanning the document, and then sending the altered Complaint to the Council as if it were in the original form." (*Id.* ¶ 41.) "Wilber and Winkler were aware of the alteration and failed to notify the Council." (*Id.* ¶ 96.)

On August 29, 2023, Plaintiff filed a second complaint against Douglass "about the failure to address the complaint regarding Defendant Winkler and the discovery of Defendant Douglass' subsequent surreptitious alteration of the complaint." (*Id.* ¶ 89.)

On September 7, 2023, about one week later, Plaintiff received a "letter of intent to terminate" from Cottonwood. (*Id.* ¶ 61.) One of the reasons given for his termination was the ACRD Report and "that [Plaintiff] 'discriminated' against a 'female detective.'" (*Id.* ¶¶ 52, 61.) However, "[t]he ACRD report was . . . not included in notice of investigation nor mentioned as a concern in [OM's] investigation or findings." (*Id.* ¶ 68.) As a result, Plaintiff "was not given an opportunity to respond or refute this false allegation prior to the Notice of Intent to Terminate." (*Id.* ¶¶ 62.)

"At no time before or during the four months [Plaintiff] was on administrative leave was the ACRD Report referenced as a concern." (*Id.* ¶ 62.) Instead, Cottonwood's attorneys "repeatedly only referenced [Plaintiff's] tone of voice when speaking to Defendant Rodriguez as the justification for termination," and one of Cottonwood's attorneys "repeatedly indicated [Plaintiff's] role in the ACRD Report was based entirely on an obscure ADA technicality." (*Id.* ¶¶ 42, 63.)

On September 14, 2023, "[Plaintiff] was notified of his termination." (*Id.* ¶ 69.) "Douglass was the City Manager who terminated [Plaintiff] and stated it was his decision because [Plaintiff] served at the pleasure of the 'City Manager.'" (*Id.* ¶ 83.) "Pursuant to A.R.S. § 38-1106, [Plaintiff] timely appealed the decision." (*Id.* ¶ 69.) However, "Douglass stated that [Plaintiff] was not entitled to an appeal because he was the Chief of Police." (*Id.* ¶ 70.)

Plaintiff alleges that "Wilber was fully aware [Plaintiff] was being terminated for false cause" even though "she herself concurred with the action that resulted in the ACRD ADA technical violation along with the City Manager and attorneys. She was also aware

of the egregious procedural errors violating [Plaintiff's] statutory rights," but "[r]ather than fulfill her role in protecting employee rights, [she] aided the other Defendants by helping to facilitate [Plaintiff's] wrongful termination." (*Id.* ¶¶ 71-72.)

Plaintiff alleges the real reason he was terminated was in retaliation for reporting statutory violations committed by Defendants. (*Id.* ¶¶ 75-76, 91.) "As a result of Defendants' actions, Plaintiff has been damaged. His ability to run for public office, obtain employment in his field, or secure contracting work via his consulting business following his highly successful 34-year law enforcement career has now been irreparably harmed due to the actions of the Defendants." (*Id.* ¶ 79.)

II.    Procedural History

On April 3, 2024, Plaintiff filed a complaint in Yavapai County Superior Court. (Doc. 1-1 at 3-27.)

On May 10, 2024, Defendants filed a notice of removal. (Doc. 1.) The sole jurisdictional basis for removal was that the complaint asserted a federal claim under 42 U.S.C. § 1983. (*Id.* ¶ 5.) Due to the presence of federal-question jurisdiction over this claim, Defendants asserted that the Court also "has supplemental jurisdiction over the state law causes of action." (*Id.*)

On May 22, 2024, Plaintiff filed a First Amended Complaint ("FAC"). (Doc. 6.) It asserted two state-law claims against Cottonwood for wrongful termination (Counts One and Two); a state-law claim against Cottonwood, Douglass, Wilber, and Winkler for "Tampering With Public Records" (Count Three); a state-law claim against all Defendants for violating Arizona's "Open Meeting Laws" (Count Four); a state-law claim against Kurot for defamation (Count Five); and a claim against all Defendants except Kurot under 42 U.S.C. § 1983 (Count Six). (*Id.* ¶¶ 80-126.)

On May 30, 2024, Plaintiff moved to disqualify Defendants' counsel. (Doc. 8.)

On June 10, 2024, Defendants filed a motion to dismiss the FAC. (Doc. 13.)

On December 6, 2024, the Court denied the disqualification motion. (Doc. 17.)

On March 27, 2025, the Court granted Defendants' motion to dismiss the FAC.

(Doc. 20.)  In a nutshell, the Court held that Count Six was subject to dismissal for failure to state a claim and then, having dismissed Plaintiff's sole federal claim, declined to continue exercising supplemental jurisdiction over Plaintiff's remaining state-law claims. (*Id.* at 22-23.)  The Court also granted Plaintiff's request for leave to amend as to the portion of Count Six that asserted a procedural due process claim pursuant to § 1983[1] and authorized Plaintiff to reassert the state-law claims in Counts One through Five if he chose to amend as to Count Six.  (*Id.* at 25.)

On April 10, 2025, Plaintiff filed the SAC.  (Doc. 21; Doc. 23 [redlines].)

On April 23, 2025, Defendants filed the pending motion to dismiss.  (Doc. 25.)  The motion is now fully briefed (Docs. 26, 27) and neither side requested oral argument.

**DISCUSSION**

I.     Count Six

A.     **Legal Standard**

Under Rule 12(b)(6), "to survive a motion to dismiss, a party must allege sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *In re Fitness Holdings Int'l, Inc.*, 714 F.3d 1141, 1144 (9th Cir. 2013) (cleaned up).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  "[A]ll well-pleaded allegations of material fact in the complaint are accepted as true and are construed in the light most favorable to the non-moving party." *Id.* at 1144-45 (citation omitted).  However, the court need not accept legal conclusions couched as factual allegations.  *Iqbal*, 556 U.S. at 678-80.  Moreover, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678.  The court also may dismiss due to "a lack of a cognizable legal theory." *Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1065 (9th Cir. 2015) (citation omitted).

---

[1]     The version of Count Six asserted in the FAC, and dismissed in the March 2025 order, was premised on both procedural and substantive due process theories.  The Court did not grant leave to amend as to the latter theory.

B.    **Required Elements**

Count Six is a § 1983 claim premised on the violation of Plaintiff's constitutional right "to procedural due process." (Doc. 21 ¶ 115.) The March 2025 order identified the elements of such a claim. (Doc. 20 at 7-9.) In summary, "[a] procedural due process claim has two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural protections." *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 931 (9th Cir. 2017). State law is relevant when it comes to the first element, as "[a] government employee has a constitutionally protected property interest in continued employment when the employee has a legitimate claim of entitlement to the job. Laws, rules or understandings derived from independent sources such as state law create such claims of entitlement." *Portman v. Cty. of Santa Clara*, 995 F.2d 898, 904 (9th Cir. 1993) (citation omitted).

The second element of a procedural due process claim poses "a question of federal, not state, law." *Roybal*, 871 F.3d at 933. This is because "[f]ederal due process does not necessarily entitle a plaintiff to the same procedures provided by state law. Rather, under federal law, what process is due is determined by context, to be analyzed in accordance with the three-part balancing test described in [*Mathews v. Eldridge*, 424 U.S. 319 (1976)]." *Id.* Under that test, "[t]o satisfy federal due process minimums, . . . employees need only receive notice and an opportunity for a hearing before being deprived of their property interest." *Id.*

C.    **Analysis**

1.    *Veach* And The 2022 POBOR Amendment

During the last round of motion-to-dismiss briefing, Defendants advanced an array of reasons why Plaintiff's procedural due process-based § 1983 claim in Count Six should be dismissed. One of Defendants' arguments was that because Plaintiff was an at-will employee under state law, he lacked a protected property interest in his position as Chief of Police, which is a prerequisite to the assertion of a procedural due process claim. (Doc. 13 at 14 ["Plaintiff was an at-will employee of the City at the time of his termination and

had no property interest in his employment."].)  In response, Plaintiff argued, *inter alia*, that the 2022 amendment to the Arizona Peace Officer Bill of Rights ("POBOR") gave him a claim of entitlement to his position.  (Doc. 18 at 9-11.)

As of March 2025, no Arizona state court had addressed this issue.  Nor had any federal appellate court.  The only existing decision at that time was *Blunt v. Town of Gilbert*, 2024 WL 2722167 (D. Ariz. 2024).  There, a peace officer who had been hired as an at-will employee (via a written employment agreement) argued that he subsequently acquired a protected property interest in his position by virtue of the 2022 POBOR amendment, such that he could assert a procedural due process-based § 1983 claim to challenge his September 2023 termination.  *Id.* at *1-2.  The district court in *Blunt* disagreed: "The employment agreement stands as written, and Plaintiff Blunt was legally an at-will employee of the Town.  In turn, Plaintiff Blunt did not have a constitutionally protected interest in his employment.  The 2022 amendment does not retroactively apply to the agreement or preempt the employment agreement between Plaintiff Blunt and the Town.  Accordingly, because Plaintiff Blunt lacks a constitutionally protected interest in his employment, Count I [procedural due process] will be dismissed with prejudice." *Id.* at *5 (citation omitted).

Nevertheless, given the absence of appellate guidance on this issue at the time, and because Defendants had also identified alternative reasons why Count Six was subject to dismissal, the Court declined in the March 2025 order to reach the merits of the parties' POBOR-related arguments.  Instead, the Court more narrowly held that (1) the Individual Defendants were entitled to qualified immunity as to Plaintiff's procedural due process claim because Plaintiff failed to "identify a prior case . . . that would have imparted notice to the Individual Defendants at the time of their challenged conduct that Plaintiff had a protected property interest in his position as the Cottonwood Chief of Police"; and (2) Cottonwood could not be held liable under *Monell v. Dep't of Soc. Servs. of the City of New York*, 436 U.S. 658 (1978), with respect to Count Six because the FAC failed to allege sufficient facts to establish that the alleged violation was the result of a policy, custom, or

practice, was committed by a final policymaker, or was ratified. (Doc. 20 at 10-20.) The Court acknowledged, moreover, that if Defendants' POBOR-related arguments were correct, they would be entitled to dismissal on that basis, too. (*Id.* at 13, citation omitted ["Although Defendants urge the Court to find that *Blunt* was correctly decided and to determine that the 2022 POBOR amendment was inapplicable to Plaintiff, it is unnecessary to go that far in resolving the Individual Defendants' request for qualified immunity."]; *id.* at 20 n.4 ["The Court acknowledges that if Defendants are correct about the disputed property-interest issue . . . , this would provide an alternative basis for dismissing Count Six as to Cottonwood."].)

In the most recent round of motion-to-dismiss briefing, the parties reassert their POBOR-related arguments. (Doc. 25 at 4-5 ["As outlined in Defendants' prior Motion, Plaintiff remained an at-will employee because: (1) he served at the pleasure of the City Manager at the time of his hiring as reflected in the City's code; (2) his at-will status became a term of his implied contract with the City; (3) the 2022 amendments to the POBOR, which allegedly modified Plaintiff's at-will status, were not retroactive; and (4) the application of the 2022 POBOR amendments to Plaintiff would violate the Contract Clause. Because there were no substantive restrictions on the City's right to terminate Plaintiff's employment, he did not have any constitutionally protected property interest."]; Doc. 26 at 3-4 ["There have been no state or federal appellate court decisions on this issue thus, they have not been finally decided. . . . Plaintiff reiterates that he was in fact protected by POBOR . . . ."].) Additionally, after the motion became fully briefed, the Arizona Court of Appeals decided *Veach v. City of Chandler*, 2025 WL 2781328 (Ariz. Ct. App. 2025). The plaintiff in *Veach* was a police officer employed by the City of Chandler who entered into a written at-will employment contract in 2020, was terminated in 2023, and then sought to appeal the termination decision pursuant to the procedural rights set forth in the POBOR. *Id.* at *1. After the city refused to entertain his appeal, on the ground that he had no POBOR rights, the plaintiff filed an action in Maricopa County Superior Court. *Id.* The trial court dismissed his lawsuit, concluding that he was an at-will employee despite the

1    2022 POBOR amendment, and the appellate court unanimously affirmed, holding that

2    "Chandler's right to treat Veach as an at-will employee, including the right to terminate

3    him without just cause, vested when the parties executed the at-will agreement in 2020"

4    and that "the 2022 statute does not apply to Veach." *Id.* at *2, 4. In a notice of

5    supplemental authority, Defendants argue that *Veach* supports dismissal of Count Six.

6    (Doc. 28.) Plaintiff has not responded.

7        At first blush, the intervening development of *Veach* would appear to provide a

8    reason to wade into the merits of the POBOR amendment issue that the Court declined to

9    address in the March 2025 order.[2] *Veach* addresses whether an Arizona police officer hired

10   pursuant to an at-will employment contract before the effective date of 2022 POBOR

11   amendment should be deemed to have acquired a protected property interest in the position

12   by virtue of the 2022 POBOR amendment. Under *Veach*, the answer to that question is no.

13   And although *Veach* is an unpublished decision of an intermediate state court, the parties

14   have identified no convincing reason to believe the Arizona Supreme Court would decide

15   the issue any differently. *In re Kirkland*, 915 F.2d 1236, 1238-39 (9th Cir. 1990) ("When

16   interpreting state law, a federal court is bound by the decision of the highest state court. In

17   the absence of such a decision, a federal court must predict how the highest state court

18   would decide the issue using intermediate appellate court decisions, decisions from other

19   jurisdictions, statutes, treatises, and restatements as guidance. However, in the absence of

20   convincing evidence that the highest court of the state would decide differently, a federal

21   court is obligated to follow the decisions of the state's intermediate courts.") (cleaned up).

22       Nevertheless, the Court is not entirely persuaded that *Veach* controls the property-

23   right analysis here. On the one hand, Defendants are correct that when Plaintiff began

24   serving as the Cottonwood Chief of Police, which occurred before the effective date of the

25   2022 POBOR amendment,[3] Plaintiff was an at-will employee. Although Plaintiff alleges

26   _____

27   [2]    As for further developments in *Blunt*, the Ninth Circuit held oral argument in May 2025 but had not, as of the date of this order, issued a decision.

28   [3]    Although the record does not reveal exactly when Plaintiff was hired as Chief of Police, references in the SAC to Plaintiff's conduct as Chief of Police in June 2022 (Doc. 21 ¶¶ 26, 45, 56) demonstrate that the hiring necessarily occurred before September 24,

in the SAC that he "did not sign an 'at will contract'" (Doc. 21 ¶ 120), Plaintiff ignores that the Cottonwood municipal code expressly states that "[t]he police chief shall be appointed by and shall serve at the pleasure of the city manager." Cottonwood City Code § 2.44.030. *See generally Higginbottom v. State*, 51 P.3d 972, 975 (Ariz. Ct. App. 2002) ("It has long been the rule in Arizona that a valid statute is automatically part of any contract affected by it, even if the statute is not specifically mentioned in the contract."); *Alpha, LLC v. Dartt*, 304 P.3d 1126, 1130 (Ariz. Ct. App. 2013) (citing Illinois decision for the proposition that "an ordinance is a legislative act and is the equivalent of a municipal statute").[4] Thus, at the time of his hiring, Plaintiff lacked a protected property interest in his position. *See, e.g.*, *Portman*, 995 F.2d at 904 ("If under state law, employment is at-will, then the claimant has no property interest in the job."); *Brady v. Gebbie*, 859 F.2d 1543, 1548 (9th Cir. 1988) ("Where state employees serve at the will of the appointing authority, . . . there is no such reasonable expectation of continued employment, and thus no property right."). Defendants are also correct that although Plaintiff's at-will employment relationship with Cottonwood was not memorialized in a written contract, it was still contractual in nature. *See, e.g.*, A.R.S. § 23-1501(A)(1) ("The public policy of this state is that . . . [t]he employment relationship is contractual in nature."); *Swingle v. Myerson*, 509 P.2d 738, 740 (Ariz. Ct. App. 1973) ("There is no difference in the legal effect between an express contract and an implied contract.").

On the other hand, this case—unlike *Veach* and *Blunt*—does not involve a *written* employment contract, and the outcome in *Veach* turned on the fact that the City of Chandler's "substantive rights in its at-will agreement with Veach vested before the 2022

---

2022, which was the effective date of the POBOR amendment.

[4]    Furthermore, the position of Chief of Police is designated in a Cottonwood administrative regulation as one of the positions that "serve[s] at the pleasure and will of the City Manager." *See* Cottonwood Admin. Reg. 8, available at https://cottonwoodaz.gov/DocumentCenter/View/6718/AR-8-10-14-2019?bidId [https://perma.cc/3FKL-83S4].    To the extent Plaintiff argues that the information appearing in the administrative regulation previously appeared in Cottonwood's policy manual but was later removed (Doc. 26 at 6-7 [arguing that the revision occurred in "July of 2021"]), Plaintiff does not explain why this somehow supports his position.

statute existed," because "Chandler's right to treat Veach as an at-will employee, including the right to terminate him without just cause, vested when the parties executed the at-will agreement in 2020." *Veach*, 2025 WL 2781328 at *4. That analysis makes sense in the context of a written employment agreement, but the analysis may be different here. As the Arizona Supreme Court has explained, "[a]t-will employment contracts are unilateral and typically start with an employer's offer of a wage in exchange for work performed; subsequent performance by the employee provides consideration to create the contract. Thus, before performance is rendered, the offer can be modified by the employer's unilateral withdrawal of the old offer and substitution of a new one: the employer makes a new offer with different terms and the employee again accepts the new offer by performance (such as continued employment). Thus a new unilateral contract is formed—a day's work for a day's wages." *Demasse v. ITT Corp.*, 984 P.2d 1138, 1142-43 (Ariz. 1999) (citation omitted). Such arrangements result in "day-to-day unilateral contract offers and acceptances." *Cornell v. Desert Fin. Credit Union*, 524 P.3d 1333, 1337 (Ariz. 2023). If, per these Arizona authorities, the proper way to conceptualize Plaintiff's work for Cottonwood (at least in the absence of a written employment contract) was as the formation of a new daily contract each day that Plaintiff agreed to work for Cottonwood, then it is difficult to see how the daily contracts formed after the effective date of the 2022 POBOR amendment could still qualify as at-will contracts. *Veach*, 2025 WL 2781328 at *4 ("[T]he statute's most immediate impact is to prohibit employers and peace officers from bargaining for at-will agreements, which the 2014 statute preserved. In other words, whether Veach is entitled to the POBR's procedural protections most immediately turns on whether he entered an at-will agreement before the 2022 statute . . . .").

With that said, it remains unnecessary to resolve this complicated issue for purposes of this case. Even assuming for the sake of argument that Plaintiff's understanding of the 2022 POBOR amendment is correct, such that he had acquired a protected property interested in his position as Chief of Police by the time of his termination in the fall of 2023, his procedural due process-based § 1983 claim remains subject to dismissal for the

same reasons identified in the March 2025 order—namely, he cannot overcome the Individual Defendants' invocation of qualified immunity and he has failed to allege sufficient facts to hold Cottonwood liable under a *Monell* theory.

2. The Individual Defendants

In the March 2025 order, the Court determined that the Individual Defendants were entitled to qualified immunity because Plaintiff made no effort to identify prior case law that "would have imparted notice to the Individual Defendants at the time of their challenged conduct that Plaintiff had a protected property interest in his position as the Cottonwood Chief of Police by virtue of the 2022 amendment to the POBOR." (Doc. 20 at 14.) The Individual Defendants again seek dismissal of Count Six on this ground, arguing that Plaintiff's alleged "property interest in his employment" was not clearly established at the time of the challenged conduct. (Doc. 25 at 5.)

In response, Plaintiff once again does not attempt to identify a prior case that might qualify as clearly established law supporting his position. (Doc. 26 at 8.) Instead, Plaintiff simply attempts to explain why *Blunt* is factually distinguishable: "Plaintiff, unlike the Plaintiff in *Blunt*, did not sign a contract saying he was at will." (*Id.*) But this approach misunderstands how qualified immunity works. It is not the Individual Defendants' burden to identify a case vindicating their position. Rather, and as explained in the March 2025 order, "[t]he plaintiff bears the burden of pointing to prior case law that articulates a constitutional rule specific enough to alert these officers in this case that their particular conduct was unlawful. The necessity of identifying a prior case with similar facts is particularly pronounced in the context of procedural due process claims." (Doc. 20 at 13-14, cleaned up.) Plaintiff has not even attempted to meet that burden here.

Plaintiff's only remaining argument on the issue of qualified immunity is that because the NOI form stated that he had "rights under A.R.S. §38-1102," because the investigator from OM "followed POBAR [sic] procedures for part of the investigation," and because he "was specifically told during his interview with the City's investigator that he had rights under POBAR," these interactions show that "[t]he Individual Defendants

- 14 -

were in fact aware of Plaintiff's rights to procedural due process in his position." (Doc. 21 ¶¶ 120, 121. *See also* Doc. 26 at 9 ["The recognition by the employees themselves shows that knowledge of Plaintiff's rights."].) This argument is unavailing. As the Ninth Circuit has explained, "to determine whether the defendants are entitled to qualified immunity, we do not consider whether they subjectively understood" they were violating the law— "[r]ather, we conduct an objective examination of whether established case law would make clear to every reasonable official that the defendant's conduct was unlawful in the situation he confronted." *Russell v. Lumitap*, 31 F.4th 729, 740 (9th Cir. 2022) (cleaned up). *See also Sandoval v. Cnty. of San Diego*, 985 F.3d 657, 673 (9th Cir. 2021) ("[E]ven where the clearly established legal standard requires [subjective] deliberate indifference, the qualified immunity inquiry should concentrate on the objective aspects of the constitutional standard.") (citation omitted). Thus, "to defeat qualified immunity, [Plaintiff] must show that, given the available case law at the time, a reasonable official, knowing what [the Individual Defendants] knew, would have understood that their actions . . . [were] unconstitutional." *Russell*, 31 F.4th at 740. For the reasons discussed in the preceding paragraph, Plaintiff has not made that showing here.

### 3. Cottonwood

In the March 2025 order, the Court dismissed Count Six as to Cottonwood because "the FAC's allegations [were] insufficient under *Monell* to state a procedural due process claim." (Doc. 20 at 20.) More specifically, the Court concluded that the FAC failed to allege "any facts that plausibly suggest Cottonwood had an official policy of violating employees' procedural due process rights," "sufficient facts to support liability under a 'practice or custom' theory," sufficient facts to support "a 'final policymaker' theory," or "well-pleaded allegations . . . suggesting [ratification]." (*Id.* at 18-20.)

The SAC contains only a handful of new factual allegations intended to address these deficiencies. The new allegations appear in paragraphs 126 and 127,[5] which provide:

---

[5] The paragraphs on pages 25-26 of the SAC are numbered, in sequence, "125," "126," "127," "127," and "126." The new factual allegations referenced above appear in the first paragraph 126 and the first paragraph 127.

1

126.    Defendant City of Cottonwood had a practice or custom of allowing the Mayor and or City Manager to make policy as demonstrated by Exhibit L, in which the former Council Member hereby states that there was an ongoing and frequent practice of allowing these actors to make decisions on their own such that these decisions represented official policy.  These actions extended not just to Plaintiff but many other employees as well.

127.    Alternatively, Defendant City of Cottonwood authorized the City Manager and/or Mayor to be a final policymaker such as in determining whether to provide appropriate executive session notices, terminate employees, or ignore procedures that were in place for discipline.  This is shown not only by the actions but by the very language of claiming Plaintiff was "at will"- that the position served at the pleasure of the City Manager which necessitates a wielding of power to the City Manager, here Defendant Douglas.

(Doc. 23 at 28-29 ¶¶ 126, 127.)

In their motion, Defendants argue that the *Monell* claim against Cottonwood still fails because the SAC does not allege that "due process violations occurred pursuant to an official policy or custom or were committed or ratified by a final policymaker," as "only the City Council has the authority to create personnel policies regarding procedural due process."  (Doc. 25 at 5-6.)  According to Defendants, the SAC "regurgitates the same discredited argument that the City Manager was a final policymaker based on his authority to terminate Plaintiff" and "makes vague and conclusory allegations that the City has a custom of allowing the Mayor and City Manager to create policy."  (*Id.* at 6.)  Defendants further argue—in reference to Plaintiff's Exhibit L, which includes affidavits by former Cottonwood City Council members Lisa DuVernay ("DuVernay") and Michael Mathews ("Mathews") (Doc. 21-1 at 68-74) and two letters from DuVernay's counsel (Doc. 24 at 6-8)—that "Exhibit L to the SAC does nothing to salvage Plaintiff's due process claim" because "[e]ven assuming the veracity of the allegations in the letters, there is nothing that remotely suggests that the City has an established practice of *denying employees' procedural due process rights* . . . .  Instead, the letter describes two isolated and/or sporadic instances unrelated to due process."  (Doc. 25 at 10.)

In response, Plaintiff argues that Exhibit L "make[s] it clear that Defendants repeatedly ignored the city code and statutes and made decisions on their own, which the Defendant City did not correct as a practice." (Doc. 26 at 10.)  Plaintiff contends that, as a result, he "has set forth sufficient facts to address the court's concern that Elinski, Rodriguez, Winkler, Douglass, and/or Wilber qualify as final policymakers and thus the Defendant City can be held liable if it delegated its policymaking authority or that its policymakers ratified the unconstitutional conduct." (*Id.*)  Plaintiff further argues that "Cottonwood authorized the City Manager and/or Mayor to be a final policymaker, such as in determining whether to provide appropriate executive session notices, terminate employees, or ignore procedures that were in place for discipline.  This is shown not only by the actions but by the very argument claiming Plaintiff was 'at will'- that the position served at the pleasure of the City Manager which necessitates a wielding of power to the City Manager, here Defendant Douglas." (*Id.* at 11.)

In reply, Defendants reiterate that "Plaintiff has not cited to *any other instances in which a City employee was allegedly denied due process*.  Instead, Plaintiff alleges that the City (1) failed to agendize the appointment of an Acting City Manager; (2) violated requirements for executive sessions; and (3) allowed the Deputy City Manager to assume the role of Acting City Manager without authority—none of which relate to the procedural protections due to a terminated employee." (Doc. 27 at 7.)  Defendants also argue that "Plaintiff confuses involvement in a decision with ratification" and that "to establish liability, Plaintiff must prove that a final policymaker made a deliberate choice to deny Plaintiff an appeal hearing for unconstitutional reasons," which "Plaintiff has not even attempted to plausibly satisfy." (*Id.* at 8-9.)

The Court agrees with Defendants that the SAC fails to allege any facts that suggest Cottonwood had an official policy of violating employees' procedural due process rights.  Instead, the SAC simply repeats the FAC's allegation that because "the Mayor, City Manager, City Attorney and City Council were involved in the process and decision, the actions represented official policy." (Doc. 21 ¶ 124; Doc. 23 ¶ 124.)  That allegation

remains insufficient—Plaintiff "has not directed us to any policy, officially adopted and promulgated by the City." *Delia v. City of Rialto*, 621 F.3d 1069, 1082 (9th Cir. 2010), *abrogated on other grounds by Filarsky v. Delia*, 566 U.S. 377 (2012).

Nor does the SAC allege sufficient facts to support liability under a practice or custom theory. "[L]iability for improper custom may not be predicated on isolated or sporadic incidents; it must be founded upon practices of sufficient duration, frequency and consistency that the conduct has become a traditional method of carrying out policy." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996). In an effort to establish the existence of such a policy or custom, Plaintiff points to Exhibit L, which sets forth various allegations of past misconduct committed by Cottonwood officials. (Doc. 21-1 at 69 ¶ 3 [DuVernay: "[Elinski] subsequently directed the Clerk to remove the Requested Agenda Item, in violation of the Cottonwood City Code . . . ."]; *id.* at 69 ¶ 4 [DuVernay: "[A]s to [Plaintiff] three council members requested his presence as the department head during an executive session, but we faced opposition from [Elinski] . . . ."]; *id.* at 69 ¶ 7 [DuVernay: "Another instance of [Elinski] disregarding city ordinances . . . occurred when the council received the agenda just 24 hours before the meeting . . . ."]; *id.* at 71 ¶ 2 [Mathews: "I personally observed [Elinski]'s influence over the city manager . . . resulting in the termination of several employees that [Elinski] disliked."]; *id.* at 72 ¶ 3 [Mathews: "I also experienced legal intimidation from [Winkler] . . . . She attempted to have me admit to illegal possession and implicate others at the same time."]; *id.* at 72 ¶ 4 [Mathews: "I was also a witness to the conspiracy of [Elinski], [Douglass], and [Winkler] to discredit and destroy Council Member Palosaari in retaliation for being key to having me appointed to the city council and thereby changing the balance of power away from the mayor."]; Doc. 24 at 8 [DuVernay's counsel: "DuVernay has recently become aware that [Rodriguez] [is] executing the duties and functions of the City Manager without authority."].) According to Plaintiff, these allegations demonstrate that "Cottonwood had a practice or custom of allowing the Mayor and or City Manager to make policy." (Doc. 21 at 25 ¶ 126.)

These arguments lack merit. None of the alleged incidents detailed in Exhibit L

involved violating employees' procedural due process rights in connection with a termination. Because the SAC merely alleges incidents of misconduct untethered to the conduct underlying Count Six, it fails to state a practice or custom claim. *See, e.g., Williams v. Garcia*, 2023 WL 2139655, *5-6 (C.D. Cal. 2023) (dismissing *Monell* claim where the defendant argued that the complaint merely "describe[d] customs and policies that are unrelated to this action" and emphasizing that "the asserted policy must be closely related to the ultimate injury") (cleaned up); *Ingall v. Rabago*, 2021 WL 431467, *8 (D. Hawaii 2021) ("Plaintiff's broad articulation of purported policies, patterns, and customs simply do not make any sense when considered against the different conduct and context alleged with respect to each of the incidents. . . . [T]he policies, customs, and practices Plaintiff alleges are either too generic or too tenuous.").

The SAC's allegations are also insufficient under a final policymaker theory. "[W]hether a particular official has 'final policymaking authority' is a question of *state law*." *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123 (1988) (emphasis in original). Federal courts consider "the relevant legal materials, including state and local positive law, as well as 'custom or usage' having the force of law." *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 737 (1989).

In the March 2025 order, the Court concluded that the allegations in the FAC were insufficient to support a final policymaker claim because "Plaintiff has not made any attempt to identify any provision of state or municipal law that plausibly suggests the Mayor, City Manager, or City Attorney wielded final policymaking authority with respect to the challenged due process violations at issue here. Nor has Plaintiff responded to Defendants' argument that those actors cannot act independently of the City Council, which 'may only create policy through a majority vote at a properly noticed, formal council meeting.'" (Doc. 20 at 19.) The only new allegation in the SAC intended to address this deficiency is the allegation in paragraph 127 that "Cottonwood authorized the City Manager and/or Mayor to be a final policymaker such as in determining whether to provide appropriate executive session notices, terminate employees, or ignore procedures that were

in place for discipline.  This is shown not only by the actions but by the very language of claiming Plaintiff was 'at will'- that the position served at the pleasure of the City Manager which necessitates a wielding of power to the City Manager, here Defendant Douglas." (Doc. 21 at 25-26 ¶ 127.)

This new allegation is insufficient.  The mere fact that the Cottonwood City Code states that the Chief of Police serves at the pleasure of the City Manager (Doc. 25 at 4) does not establish that the City delegated final policymaking authority to the City Manager or that the City Manager is a final policymaker when it comes to compliance (or lack thereof) with employment-related procedural requirements created by the City Council. *See, e.g.*, *Pembaur v. City of Cincinnati*, 475 U.S. 479, 483 n.12 (1986) ("[T]he County Sheriff may have discretion to hire and fire employees without also being the county official responsible for establishing county employment policy. . . .  [I]f county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability.  This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be a decision of the Board."); *Gillette v. Delmore*, 979 F.2d 1342, 1349-50 (9th Cir. 1992) (rejecting *Monell* claim in § 1983 action brought by firefighter who claimed he was suspended from his employment in retaliation for exercising his First Amendment rights, where one of the plaintiff's theories was that "Fire Chief Hall was . . . a 'policymaker' whose individual decision could be attributed to the City under *Monell* . . . [because] Hall had final authority with respect to disciplining fire fighters and had been delegated de facto authority to establish personnel policy within the Fire Department," because "the Eugene City Charter and ordinances grant authority to make City employment policy only to the City Manager and the City Council"); *Delia*, 621 F.3d at 1083 ("This argument confuses final decisionmaking authority with final policymaking authority.").  Plaintiff has failed to identify any provision of state or municipal law that plausibly suggests that the Mayor, City Manager, or City Attorney wielded final *policy*making authority with respect to the

1  challenged due process violations at issue here.

2  Finally, with respect to ratification, the SAC and Plaintiff's response brief merely

3  repeat arguments the Court previously rejected.  Plaintiff again argues that the "City

4  Council itself . . . [was] directly involved in the termination process, thus ratifying it."

5  (Doc. 26 at 10.)  However, ratification "requires an official policymaker make a deliberate

6  choice from among various alternatives to follow a particular course of action."  *Gillette*,

7  979 F.2d at 1348.  "[A] policymaker [must] approve a subordinate's decision *and the basis*

8  *for it* before the policymaker will be deemed to have ratified the subordinate's discretionary

9  decision."  *Id.*    Thus, where a plaintiff merely alleges that the relevant municipal

10  policymaker "did not overrule a discretionary [employment] decision" by another

11  municipal official, this "cannot form the basis of municipal liability under section 1983."

12  *Id.*  "To hold cities liable under section 1983 whenever policymakers fail to overrule the

13  unconstitutional discretionary acts of subordinates would simply smuggle *respondeat*

14  *superior* liability into section 1983 law. . . .  We decline to endorse this end run around

15  *Monell*."  *Id.*

16  Because the SAC's allegations are insufficient to state a procedural due process

17  claim against Cottonwood, Count Six is dismissed.

18  II.    The Remaining Claims

19  Defendants also seek dismissal of Plaintiff's state-law claims in Counts One through

20  Five and to strike portions of the SAC that contain references to material purportedly

21  considered confidential under state law.  (Doc. 25 at 11.)  The Court finds it unnecessary

22  to reach the merits of those arguments.

23  "[A] district court has discretion to remand to state court a removed case involving

24  pendent [state-law] claims upon a proper determination that retaining jurisdiction over the

25  case would be inappropriate."  *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 357 (1988).

26  "The discretion to remand enables district courts to deal with cases involving pendent

27  claims in the manner that best serves the principles of economy, convenience, fairness, and

28  comity which underlie the pendent jurisdiction doctrine."  *Id.*  "[I]n the usual case in which

- 21 -

1    all federal-law claims are eliminated before trial, the balance of factors to be considered

2    under the pendent jurisdiction doctrine—judicial economy, convenience, fairness, and

3    comity—will point toward declining to exercise jurisdiction over the remaining state-law

4    claims." *Id.* at 350 n.7 (1988).  *See also* 28 U.S.C. § 1367(c)(3) ("The district courts may

5    decline to exercise supplemental jurisdiction over a [pendent state-law claim] if . . . the

6    district court has dismissed all claims over which it has original jurisdiction.").

7          The Court has considered the relevant factors and concludes that they favor remand.

8    The parties all appear to be Arizona citizens.  (Doc. 21 ¶¶ 2-8.)  The sole basis for removal

9    was the presence of federal-question jurisdiction over Plaintiff's § 1983 claim, which in

10   turn conferred supplemental jurisdiction over the remaining state-law claims.  (Doc. 1 ¶ 5.)

11   It also appears the Yavapai County Superior Court is at least as convenient a forum as this

12   Court.  *Cf. Shooter v. Arizona*, 2019 WL 2410808, *8 (D. Ariz. 2019), *aff'd*, 4 F.4th 955

13   (9th Cir. 2021) (concluding the same under similar circumstances).  Most important,

14   considerations of federalism and comity are best served by allowing the Arizona state

15   courts to address state-law claims.  *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715,

16   726 (1966) ("Needless decisions of state law should be avoided both as a matter of comity

17   and to promote justice between the parties, by procuring for them a surer-footed reading of

18   applicable law.").

19   III.   Attorneys' Fees

20          Defendants include in their motion to dismiss a request for "an award of attorneys'

21   fees based on Plaintiff's continuing efforts to assert groundless and frivolous claims."

22   (Doc. 25 at 11.)  This request is denied.  Although the Court has concluded that Count Six

23   is subject to dismissal, this does not mean Count Six was frivolous.  Moreover, Defendants

24   have not prevailed in this *action*—instead, they have simply secured the dismissal of one

25   of Plaintiff's many claims.  Perhaps Defendants will emerge as the prevailing parties when

26   all is said and done, but neither side has prevailed yet.  Any request for attorneys' fees

27   should be made to the state-court judge at the conclusion of the entire litigation.

28          …

IV.    <u>Leave To Amend</u>

Plaintiff contends that "[s]hould the Court find that Count 6 has not been satisfied . . . this court [should] remand the remaining counts to state court and dismiss Count 6 as a final order so it can be appealed."  (Doc. 26 at 2.)  The Court will therefore dismiss Count Six of the SAC without leave to amend.

Accordingly,

**IT IS ORDERED** that

1.    Defendants' motion to dismiss (Doc. 25) is **granted**.

2.    Count Six of the SAC is **dismissed without leave to amend**.

3.    The Clerk of Court shall **remand** this case to the Yavapai County Superior Court and then **terminate** this action.

Dated this 2nd day of February, 2026.

_____
Dominic W. Lanza
United States District Judge